**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE

Plaintiffs

v.

PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.

Defendants

Civil No. 23-1544 (MAJ)

**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

**TO THE HONORABLE COURT:**

**COME NOW** Defendants, Hon. Pedro Pierluisi Urrutia, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Diaz, in her official capacity as the Director of the Demographic Registry and Vital

Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants"), and very respectfully STATE, ALLEGE, and PRAY as follows:

## I. INTRODUCTION

On November 15, 2023, Plaintiffs filed the Second Amended Complaint challenging Puerto Rico's Birth Certificate policy and practice to recognize only the binary male/female system. (Docket No. 12, pp. 13-19). They claim that the policy and practice to disallow transgender nonbinary people born in Puerto Rico from correcting their gender marker on their birth certificate to "X" violates their Fourteenth Amendment's right to privacy and Equal Protection and their First Amendment Right to freedom of speech. Id. Plaintiffs argue that Article 694 of the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §7655, and the Vital Statistics Registry of Puerto Rico, P.R. Laws ann. tit. 24 § 1041 et seq., are unconstitutional as applied by the Demographic Registry because they cannot change a nonbinary person's gender to "X." (Docket No. 12, ¶37).

Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their gender identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change;

and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21).

As this court will surmise, Plaintiffs failed to state a claim upon which relief may be granted on all counts. First, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender. Therefore, Defendants are not authorized by law to issue a birth certificate with a sex marker other than male or female. Second, Plaintiffs failed to allege sufficient facts to conclude that there is a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violations under the Fourteenth Amendment. Third, Plaintiffs failed to plead how the Department of Health's policy violates the Equal Protection Clause. Finally, the Department of Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, this Court must dismiss Plaintiffs' Second Amended Complaint with prejudice.

## II. STANDARD OF REVIEW FOR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Rule 12 (b)(6) of the Federal Rules of Civil Procedure allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive dismissal under Rule 12 (b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In doing so, the court must accept as true all "well-pleaded facts [and indulge] all reasonable inferences in plaintiffs' favor." Id.

In judging the sufficiency of a complaint, courts must "differentiate between well-pleaded facts, on the one hand, and bald assertions, unsupportable conclusions, periphrastic circumlocution, and the like, on the other hand; the former must be credited but the latter can be safely ignored." LaChapelle v. Berkshire Life Ins., 142 F.3d 507, 508 (quoting Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996)); Buck v. American Airlines, Inc. 476 F. 3d 29, 33 (1st Cir. 2007); see also Rogan v. Menino, 175 F. 3d 75, 77 (1st Cir. 1999).

Moreover, "even under the liberal pleading standards of Fed. R. Civ. P. 8, the Supreme Court has held that to survive a motion to dismiss, a complaint must allege a plausible entitlement to relief." Twombly, 550 U.S. at 559. Although complaints do not need detailed factual allegations, the plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Id. at 556.

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court reaffirmed Twombly and clarified that two underlying principles must guide a court's assessment of the adequacy of pleadings when evaluating whether a complaint can survive a Rule 12 (b)(6) motion. Id. at 678. The Court explained that they are not compelled to accept legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Second, a complaint survives only if it states a plausible claim for relief. Twombly, 550 U.S. at 556. Thus, any non-conclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. Id. A claim has facial plausibility when the pleaded facts allow the court to reasonably infer that the defendant is liable for the specific misconduct alleged. Iqbal, 556 U.S. at 678. This pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Id. Such inferences must amount to more than a sheer possibility and be as plausible as any obvious

alternative explanation. Id. Plausibility is a context-specific determination that requires the court to draw on its judicial experience and common sense. Id. at 679.

The Court of Appeals for the First Circuit has stated that when facts alleged in the complaint do not "possess enough heft to sho[w] that [plaintiff is] entitled to relief," the complaint must be dismissed. Ruiz Rivera v. Pfizer Pharm, LLC. 521 F3d 76, 84 (1st Cir. 2008). Plaintiff "is not entitled to proceed perforce by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (citing Iqbal, 665 U.S. at 680).

## III. DISCUSSION

### A. Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983.

Section 1983 in itself does not create substantive rights, but merely provides a venue for vindicating federal rights elsewhere conferred. Graham v. M.S. Connor, 490 U.S. 386 (1989). It creates a private right of action for redressing abridgments or deprivations of federally assured rights. Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004); Mcintosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995); Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996).

To establish liability pursuant to section 1983, a plaintiff must first establish that "the conduct complained of was committed by a person acting under color of state law." Parrat v. Taylor, 451 U.S. 527, 535 (1981). Secondly, a plaintiff must allege facts sufficient to conclude that the alleged conduct worked a denial of rights secured by the Constitution or laws of the United States. See Cepero-Rivera v. Fagundo, 474 F3d 124 (1st Cir. 2005); Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005) cited in Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145 (1st Cir. 2006). A section 1983 violation occurs when an official acting under color of state law acts to deprive an individual of a federally protected right. Maymí v. Puerto Rico Ports Authority, 515 F.3d 20, 205

(1st Cir. 2008). Moreover, plaintiffs must show that defendant's actions were the cause in fact of the alleged constitutional deprivation. Gagliardi v. Sullivan, 513 F. 3d 301, 306 (1st Cir. 2008).

Under section 1983, a plaintiff is required to allege personal action or inaction by each defendant within the scope of their responsibility that would make each of them personally answerable in damages. Pinto v. Nettleship, 737 F.2d 130, 133 (1st Cir. 1984). Plaintiff must show that the defendants were involved in the alleged deprivation of their rights. To impose liability upon a defendant, it is necessary that "the conduct complained of must have been casually connected to the deprivation." Gutiérrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989).

The element of causal connection requires that plaintiffs establish that the defendants: (i) were personally involved in the violation, see Monell v. Department of Social Services, 436 U.S. 658, 694 n. 58 (1978); and (ii) their conduct was intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights. As will be shown, the Department of Health's policy and practice does not constitute a violation of Plaintiffs constitutional rights as it is in strict compliance with the Puerto Rico Civil Code and Vital Registry's Act.

**B. The Puerto Rico Department of Health's practice and policy is in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act of Puerto Rico.**

Plaintiffs are challenging the Government's policy and practice of allowing change of gender only between male or female that does not contemplate a nonbinary gender marker. (Docket No. 12, ¶ 37). However, the Department of Health's policy and practice when issuing Birth Certificates is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. The Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the executive branch of the government and cannot issue a birth certificate with a nonbinary gender marker that has not been recognized by the Legislature.

A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it, whether or not the basis has foundation in the record. Heller v. Doe, 509 U.S. 312, 320-321 (1993) (internal quotations and citations omitted). On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §5311, et seq. The Civil Code is a general law which rules multiple issues related to human life and daily human interactions. See Statement of Motives of Puerto Rico Civil Code, Act No. 55 of June 1st, 2020, as amended. It states that all facts and judicial acts concerning a person's civil status will be registered in the Demographic Registry of Puerto Rico. Its organization and administration will be ruled by special legislation. P.R. Law ann. tit. 31 §7631. The Demographic Registry will have registration of the circumstances of birth, the registered person's name, and the person's sex at birth, among other demographic facts. Id. at §7632.

As to the modification of a person's sex in the register, article 694 of the Puerto Rico Civil Code states:

> No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.
>
> Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. (Translation ours) 31 P.R. Laws ann. tit. 31 §7655.

As to the interpretation and application of the Law, the Puerto Rico Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Laws Ann. tit. 31 §5347 (our translation).[1] As a result, the Civil Code recognizes the right of transgender individuals to change the gender marker in their birth certificates to reflect the applicants' true gender, whether its male or female.[2] However, the Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a nonbinary gender other than male or female.

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Laws ann. tit. 24 §1041 et seq. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. Id. at § 1042 (1). After the year 1931,

[1] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Laws Ann. tit. 31 §5347.

[2] This newly approved Civil Code incorporated the ruling issued by a sister court in this district. In Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) the court recognized the process for a person to request a change of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the gender marker in their birth certificates with the applicants' true gender. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, whether male or female. Arroyo, supra., at 333-334. However, neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

the Demographic Registry became a formal and credible statistical registry that allows the study of vital statistics of our population. See Statement of Motives of Act No. 220 of August 9, 1998, also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Laws ann. tit. 24 §1041 et seq. It is the instrument that contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico. The information that is contained in the Registry constitutes *prima facie* evidence of the fact to be proven. Ex Parte Delgado-Hernández, 165 D.P.R. 170, 187 (2005); Medina v. Pons, 81 D.P.R. 1, 8 n. 11 (1959); Bigas Surs. v. Comisión Industrial, 71 D.P.R. 336 (1950); Pueblo v. Ramírez, 65 D.P.R. 680 (1946); Mercado v. American Railroad Co, 61 D.P.R. 228 (1943).

In Ex Parte Delgado-Hernández, the Puerto Rico Supreme Court expressed:

> The Demographic Registry Act provides the procedure to amend the birth certificate, also as a manner of exception. The Act provides: the omissions or inaccuracies that appear on any certificate prior to being registered at the Department of Health can be corrected inserting the necessary corrections or additions in red ink on the certificate, but after being filed at the Department of Health, no rectification, addition or amendment can be made that substantially alters the same, but only by virtue of a Court Order, which shall be filed at the Department of Health making reference to the corresponding certificate.

165 DPR at p. 188.

As noted by the Puerto Rico Supreme Court, the Demographic Registry Act is complemented by section 1071-19 of the Demographic Registry Regulations, which provides:

> Corrections or alterations after the inscription is made- after the certificate has been accepted by the Registrar, it cannot be the object of any change, erasure or alteration, nor can the transcription made in the record book be changed without due process of law.

Id.

Pursuant to the Puerto Rico Civil Code, the Vital Statistics Registry Act of Puerto Rico and as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of

mistakes in a birth certificate: (i) before the certificate is registered and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. Ex Parte Delgado-Hernández, 165 D.P.R. at 189; Ex Parte León Rosario, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in Arroyo González v. Rosselló Nevarez, 305 F. Supp. 327 (D.P.R. 2018) allows for change in the birth certificate when the applicant is a male or female transgender person. Yet, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female.

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive power. The executive power contemplates the authority to execute, carry out, and enforce the laws. The executive power does not make the laws in first instance. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without legislation to that effect or a court order.

### C. The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.

Plaintiffs bring a Fourteenth Amendment substantive due process claim arguing that the Department of Health's policy, as applied, interferes with their fundamental right to individual autonomy and consists of a deprivation of liberty that "shocks the conscience." (Docket No. 12,

¶¶ 61-69). The Department of Health's policy and practice, however, is not conscience shocking under the Due Process Clause. And even assuming Plaintiffs adequately alleged a conscience shocking conduct, they failed to plead a cognizable liberty or property interest and therefore, their claims must be dismissed.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law. U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments, and (ii) a select list of fundamental rights that are not mentioned in the Constitution. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 237-238 (2022). In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." Id. "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." Dobbs, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a sate officer. Plaintiff must show that both the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. DePoutot v. Raffaelly, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

There is no scientifically precise formula for determining whether executive action is sufficiently shocking to trigger the protections of the substantive due process branch of the

Fourteenth Amendment. See Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (referring to the inquiry as "virtually standardless"). Therefore, the analysis will vary with the subject matter and circumstances.

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Depoutot, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least, extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id. A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

The First Circuit has consistently ruled that the substantive due process may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determination of a state or local decisionmakers, whether those decisions are right or wrong. Any permit or license denial, no matter how unattractive, falls short of being "truly horrendous" and is unlikely to qualify as conscience shocking for a substantive due process claim. Pagán, 448 F.3d at p. 33. This standard is rigorous but necessary since a lesser standard would run the risk of "insinuate[ing] the oversight and discretion of federal judges into areas traditionally reserved for the states and local tribunals and would dash any hope of maintaining a meaningful separation between federal and state jurisdiction," Id. (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1982)).

Plaintiffs failed to identify a fundamental right that is protected by the Fourteenth Amendment. "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding documents mean." Dobbs, supra, at

235. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. (Docket No. 12, ¶ 8; Docket Nos. 12-2, 12-3). Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' substantive due process claim must be dismissed with prejudice.

Even assuming for argument's sake only that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. They claim that since the District Court's decision in Arroyo González v. Rosselló Nevares, 305 F.Supp. 3d 327 (D.P.R. 2018), transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female), but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998. Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, ¶ 35-36). These states and

municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts. It follows that the right to include nonbinary genders on birth certificates was not reasonably considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

Plaintiffs also failed to plead how the right of a transgender person to self-determination and autonomy is an essential component of ordered liberty. An individual's freedom to act does not confer the right to compel the government to act. Brown v. Cooke, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name change and reform its records accordingly"). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of liberty, but it is not an integral component of "ordered liberty" as defined by the Supreme Court. See Dobbs, 597 U.S. at 256 ("License to act on the basis of such beliefs may correspond to one of the many understandings of "liberty," but it is certainly not "ordered liberty""). As a result, Plaintiffs have failed to allege sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate to reflect a nonbinary gender identity, or that such right is fundamental to the scheme of ordered liberty. In this way, the Second Amended Complaint must be dismissed.

**D. The Department of Health's policy and practice does not discriminate on the basis of sex and is valid under the Equal Protection Clause.**

Plaintiffs claim that because Puerto Rico's Birth Certificate policy violates the Fourteenth Amendment under the Equal Protection clause by allowing for cisgender and transgender persons to have a birth certificate that reflects their gender identity, it discriminates against a nonbinary person on the basis of sex. (Docket No. 12, pp. 13-16). They contend that Defendants' policy engages in sex-based discrimination, which is subject to heightened scrutiny. (Docket No. 12, ¶¶ 38-66). However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr. 473 U.S. 432 (1985). However, the guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. See Romer v. Evans, 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. See O.S. v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national

origin, a court will review that challenged action applying a strict scrutiny." Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008).

On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational basis review. Carney v. Okla. Dep't of Public Safety, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. This standard of review is a paradigm of judicial restraint. Id.

The SCOTUS also developed a third category, referred to as "quasi-suspect" classification, which is subject to intermediate scrutiny. However, the Court has only placed two (2) classifications in this category: sex and illegitimacy. See Reed v. Reed, 404 US. 71 (1971) (holding classifications based on sex calls for heightened standard of review); Trimble v. Gordon, 430 U.S. 762 (1977) (holding that classifications based on legitimacy were not inherently suspect but that "[i]n a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose"). These cases, however, do not provide guidance on whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy. The

Supreme Court has not expanded the scope of quasi-suspect classification and, since adding illegitimacy in 1977, has declined every opportunity to recognize a new quasi-suspect class. See City of Cleburne, 473 U.S. at 445-446 (refusing to recognize mental disabilities as a quasi-suspect classification, as "it would be difficult to find a principled way to distinguish" that classification from "a variety of other groups"); Mass. Bd. of Ret. v. Murgia, 427 U.S 307 (1976) (holding that age classifications are subject to rational basis review); Romer v. Evans, 517 U.S. 620, 633 (1996) (avoiding the question of whether a classification based on sexual orientation merits heightened scrutiny). Therefore, the heightened scrutiny has not been extended to other classifications such as classifications based on gender identity.

In the case at bar, there is a rational basis for the Department of Health to prohibit an amendment of sex designation on a birth certificate to include a gender which is neither male nor female. The Department of Health has a legitimate interest in protecting the integrity and accuracy of vital records. See, e.g., Pavan v. Smith, 582 U.S. 563 (2017) (Gorsuch J., dissenting) (rational reasons exist for a biology-based birth registration regime, like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"). Additionally, the Department of Health has a legitimate interest in maintaining a binary system for the purpose of collecting information.

Plaintiffs allege that because transgender nonbinary persons cannot obtain a birth certificate with that reflects their gender, they are deprived of the equal protection of the laws. They also allege that by having "X" in a U.S. Passport gender marker and not being able to make that change in their birth certificate, it creates a gap between the reality presented in the U.S. Passport and the one presented in the Demographic Registry. (Docket No. 12, ¶¶ 43-45). Nevertheless, neither the Due Process Clause nor the Equal Protection Clause demand logical

tidiness. The fact that a law is imperfect does not make it irrational. See Vance v. Bradley, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required").

Finally, it is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means. Equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Beach Commc'ns, 508 U.S. at 313; see also New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines…"). As a result, Plaintiffs cannot state a cognizable claim under the Due Process or Equal Protection clauses and must be dismissed with prejudice.

**E. The Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights.**

Plaintiffs' claim that Defendant's refusal to amend their birth certificates violates their first amendment right to freedom of speech by: (i) "compelling a non-nonbinary individual to identify with a sex and identity inconsistent with who they are"; and (ii) compels them to "disclose to third parties a conflict in their official documents." (Docket No. 12, ¶¶ 72-74). However, as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech

is that one who chooses to speak may also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]…only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006); see also Cressman v. Thompson, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents to someone else, has never been considered a form of expressive conduct. United States v. Cline, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

Plaintiffs allege that Defendants' birth certificate policy and practice compels transgender nonbinary people to identify with a sex and identity inconsistent with who they are. (Docket No. 12, ¶ 72). However, the content in a birth certificate is government speech and therefore does not

imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)). The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572.

The "First Amendment Free Speech Clause does not prevent the government from declining to express a view." Shurtleff v. City of Boston, 142 U.S. 243 (2022). The government-speech doctrine provides that" [w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div. Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015) ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas").

The content of a birth certificate constitutes government speech which does not imply the First Amendment. Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 121 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would

cease to function as reliable government-issued identification. Id. As a result, Plaintiff's failed to state a claim under the First Amendment and must therefore be dismissed.

## IV. CONCLUSION

Taking as true the allegations in the Second Amended Complaint, it is evident that Plaintiffs' federal claims under the First and Fourteenth Amendments fail as a matter of law. The Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender or an "X" as a gender marker as requested by Plaintiffs. Therefore, the Department of Health is not authorized by law to issue a birth certificate with a gender marker other than male or female. Additionally, Plaintiffs have failed to plead sufficient facts to show that the Department of Health's policy and practice shocks the conscience nor that there is a long history and tradition of protecting a right to amend a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty. Finally, the Department of Health's policy does not violate Plaintiffs First Amendment rights since the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, this Court must dismiss Plaintiff's Second Amended Complaint with prejudice.

**WHEREFORE**, appearing Defendants respectfully request the court to grant the present Motion to Dismiss for Failure to State a Claim and as a result, dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 22nd day of January 2024.

**DOMINGO EMANUELLI-HERNÁNDEZ**
Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Deputy Secretary in Charge of Civil Litigation

**MARCIA I. PÉREZ-LLAVONA**
Director of Legal Affairs
Federal Litigation and Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192