**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE <br><br> Plaintiffs <br><br> v. <br><br> PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of the Commonwealth of Puerto Rico; DR. CARLOS R. MELLADO LÓPEZ, in his official capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico. <br><br> Defendants | Civil No. 23-1544 (MAJ) |

**OPPOSITION TO PLAINTIFFS' MOTION TO REQUEST THE ENTRY OF A PRELIMINARY INJUNCTION**

**TO THE HONORABLE COURT:**

**COME NOW** Defendants, Hon. Pedro Pierluisi Urrutia, in his official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Carlos R. Mellado López, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants"), and very respectfully STATE, ALLEGE, and PRAY as follows:

1

## I.    INTRODUCTION

On October 27, 2023, Plaintiffs filed a Complaint against appearing Defendants (Docket No. 1). On November 15, 2023, Plaintiffs filed a Second Amended Complaint challenging Puerto Rico's Birth Certificate policy and practice to recognize only the binary male/female system. (Docket No. 12, pp. 13-19). They claim that the policy and practice to disallow transgender nonbinary people born in Puerto Rico from correcting their gender marker on their birth certificate to "X" violates their Fourteenth Amendment's right to privacy and Equal Protection and their First Amendment Right to freedom of speech. Id. Plaintiffs further argue that Article 694 of the Puerto Rico Civil Code, P.R. Laws ann. tit. 31 §7655, and the Vital Statistics Registry of Puerto Rico, P.R. Laws ann. tit. 24 § 1041 et seq., are unconstitutional as applied by the Demographic Registry because they cannot change a nonbinary person's gender to "X." (Docket No. 12, ¶37).[1]

On January 22, 2024, Defendants filed a Motion to Dismiss for Failure to State a Claim arguing that the Puerto Rico Civil Code and the Vital Statistics Registry Act do not recognize a nonbinary gender and therefore, Defendants are not authorized by law to issue a birth certificate with a sex marker other than male or female. (Docket No. 17). Defendants also argued that Plaintiffs failed to allege sufficient facts to conclude that there is a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender

---

[1] Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their gender identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change; and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21).

identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violations under the Fourteenth Amendment. Id. Moreover, Defendants argued that Plaintiffs failed to plead how the Department of Health's policy violates the Equal Protection Clause. Id.   And finally, Defendants sustained that the Department of Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. Id.

With their initial Complaint, Plaintiffs filed a Motion for Preliminary Injunction under section 1983 (Docket No. 3). On February 8, 2024, this Court Ordered appearing Defendants to file their response to Plaintiffs' request for a preliminary injunction (Docket No. 18).  Plaintiffs' arguments on their motion for preliminary injunction miss the mark and fail to establish the required four (4) elements for such an extraordinary remedy. Importantly, it is unlikely that Plaintiffs will succeed on the merits of their Fourteenth and First Amendment claims and will not suffer any irreparable harm if the preliminary injunction is denied. On the other hand, the Department of Health and the Demographic Registry have a public interest in keeping the current system to maintain uniformity between the state agencies, facilitate the search of identities, and limit unnecessary mismatches. As a result, Plaintiffs' request to enjoin the Government's birth certificate policy and practice must be denied with prejudice.

## II.    A PRELIMINARY INJUNCTION IS UNWARRANTED IN THE PRESENT CASE.

The Court of Appeals for the First Circuit has established four (4) factors in determining whether to issue a preliminary injunction, to wit: (i) the movant's probability of success on the merits; (ii) the likelihood of irreparable harm absent preliminary injunctive relief; (iii) a comparison between the harm to the movant if no injunction issues and the harm to the objectors

if one does issue; and (iv) how the granting or denial of an injunction will interact with the public interest. See New Comm Wireless Services v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002). A preliminary injunction is an "extraordinary and drastic remedy," never awarded as of right. Munaf v. Green, 553 U.S. 674, 690 (2008). Whether to issue a preliminary injunction depends on balancing equities where the requisite showing for each of the four factors turns, in part, on the strength of the others. Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611-13 (1st Cir. 1988). Although a hearing is often held prior to entry of a preliminary injunction, a hearing is not an indispensable requirement. Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988).[2] Plaintiffs have failed to meet all four prongs that are required to satisfy the issuing of a preliminary injunction. As a result, their request must be denied.

**A. Plaintiffs are unlikely to succeed on the merits.[3]**

The first prong, the movant's likelihood of success on the merits, "weighs most heavily in the preliminary injunction calculus." Shurtleff v. City of Bos., 986 F.3d 78, 85-86 (1st Cir. 2021) (citing Ryan v. U.S. Immig. & Customs Enf't, 974 F.3d 9, 18 (1st Cir. 2020)) "[I]f the movant cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id.

Plaintiffs allege that they have a likelihood of success on the merits because of their rights to freedom of speech, right to privacy, their right to individual autonomy and self determination to

---

[2] In their Preliminary Injunction, Plaintiffs stated that "to the extent that we expect defendant to stipulate to the content of their own official documents, it may be that the matter is susceptible to adjudication on the papers." Defendants stipulate the content in the "Application for Gender Change in Vital Event Certification" included in the Second Amended Complaint. (Docket No. 12-1).

[3] Being that the matters to be discussed in the instant Response were the subject of Defendants' Motion to Dismiss for Failure to State a Claim filed on January 22, 2024, Defendants hereby incorporate by reference the arguments raised in said Motion as if fully set forth herein. (Docket No. 17).

live in accordance with their gender identity and the District Court's ruling in <u>Arroyo González</u> v.

<u>Rosselló Nevares</u>, 305 F. Supp. 3d 327 (D.P.R. 2018). However, the Department of Health's policy

and practice does not constitute a violation of Plaintiffs' constitutional rights and therefore, they

are unlikely to succeed on the merits of the Second Amended Complaint.

1. **The Puerto Rico Department of Health's policy and practice is in strict compliance with the Puerto Rico Civil Code and the Vital Statistics Registry Act of Puerto Rico.**

Plaintiffs challenge the Government's policy and practice of allowing change of gender

only between male or female that does not contemplate a nonbinary gender marker (Docket No.

12, ¶37). However, the Department of Health's policy and practice when issuing birth certificates

is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. Since

the Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the

executive branch of government, they cannot issue a birth certificate with a nonbinary gender

marker that has not been recognized by the Legislature.

The Puerto Rico Civil Code recognizes the right to modify a person's gender. Article 694

states:

> No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

> Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. (Translation ours) P.R. Laws ann. tit. 31 §7655.

As to the interpretation and application of the Law, the Puerto Rico Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Laws Ann. tit. 31 §5347 (our translation).[4] As a result, the Civil Code recognizes the right of transgender individuals to change the gender marker in their birth certificates to reflect the applicants' true gender, whether its male or female.[5] The Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a nonbinary gender other than male or female.

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Laws ann. tit. 24 §1041 et seq. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. Id. at § 1042 (1). After the year 1931,

---

[4] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Laws Ann. tit. 31 §5347.

[5] This newly approved Civil Code incorporated the ruling issued by a sister court in this district. In Arroyo González v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) the court recognized the process for a person to request a change of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the gender marker in their birth certificates with the applicants' true gender. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, whether male or female. Arroyo, supra., at 333-334. However, neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

the Demographic Registry became a formal and credible statistical registry that allows the study of vital statistics of our population. See Statement of Motives of Act No. 220 of August 9, 1998, also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Laws ann. tit. 24 §1041 et seq.

Pursuant to the Puerto Rico Civil Code, the Vital Statistics Registry Act of Puerto Rico and as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of mistakes in a birth certificate: (i) before the certificate is registered; and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. Ex Parte Delgado-Hernández, 165 D.P.R. 170, 189 (2005); Ex Parte León Rosario, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in Arroyo González v. Rosselló Nevarez, 305 F. Supp. 327 (D.P.R. 2018) allows for change in the birth certificate when the applicant is a male or female transgender person.  Yet, the Puerto Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female.

## 2. The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.

In their preliminary injunction, Plaintiffs allege that the substantive protections of the Due Process Clause forbid the state from interfering with the right of a transgender person to self-determination and to live in accordance with their gender identity. (Docket No. 3, p. 5). But the Department of Health's policy and practice is not conscience shocking under the Due Process

Clause and even assuming Plaintiffs adequately alleged a conscience shocking conduct, they failed to plead a cognizable liberty or property interest.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law." U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments; and (ii) a select list of fundamental rights that are not mentioned in the Constitution. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 237-238 (2022). In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." Id. "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." Dobbs, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a state officer. Plaintiff must show that the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. DePoutot v. Raffaelly, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Depoutot, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least,

extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id.  A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

Plaintiffs have failed to identify a fundamental right that is protected by the Fourteenth Amendment and therefore, are unlikely to prevail on the merits. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. (Docket No. 12, ¶ 8; Docket Nos. 12-2, 12-3). Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' preliminary injunction must be denied.

Even assuming *in arguendo* that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they nevertheless failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected.  They claim that since the District Court's decision in Arroyo González v. Rosselló Nevares, 305 F.Supp. 3d

327 (D.P.R. 2018), transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female), but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998. Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, ¶¶35-36). These states and municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts.  It follows that the right to include nonbinary genders on birth certificates was not reasonably considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

### 3.  The Department of Health's policy and practice does not discriminate on the basis of sex and is valid under the Equal Protection Clause.

In their Preliminary Injunction, Plaintiffs claim that the Department of Health's policy and practice discriminates on the basis of sex by not providing a gender marker to those persons who do not identify as female or male. However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework and not under a heightened scrutiny.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne

Living Ctr. 473 U.S. 432 (1985). However, the guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. See Romer v. Evans, 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. See O.S. v. Carolene Products Co., 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying a strict scrutiny." Price-Cornelison v. Brooks, 524 F.3d 1103, 1109 (10th Cir. 2008). On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational basis review. Carney v. Okla. Dep't of Public Safety, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional

rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. This standard of review is a paradigm of judicial restraint. Id.

In the case at bar, there is a rational basis for the Department of Health to prohibit an amendment of sex designation on a birth certificate to include a gender which is neither male nor female. The Department of Health has a legitimate interest in protecting the integrity and accuracy of vital records. See, e.g., Pavan v. Smith, 582 U.S. 563 (2017) (Gorsuch J., dissenting) (rational reasons exist for a biology-based birth registration regime, like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"). Additionally, the Department of Health has a legitimate interest in maintaining a binary system for the purpose of collecting information.

Finally, it is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means. Equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Beach Commc'ns, 508 U.S. at 313; see also New Orleans v. Dukes, 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines…"). As a result, Plaintiffs cannot state a cognizable claim under the Due Process or Equal Protection clauses and are unlikely to succeed on the merits. Thus, their request for a preliminary injunction must be dismissed with prejudice.

**4. The Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights.**

In their preliminary injunction, Plaintiffs argue that the Department of Health's refusal to amend their birth certificate violates their First Amendment right to freedom of speech. However,

as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]…only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006); see also Cressman v. Thompson, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents to someone else, has never been considered a form of expressive conduct." United States v. Cline, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their

13

gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

The content in a birth certificate is government speech and therefore does not imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).  The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572.

Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 212 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. Id. As a result, Plaintiff's fail to prove their likelihood of success on the merits and therefore their preliminary injunction must be denied.

14

**B. Plaintiffs have not suffered irreparable harm that warrants the issuance of a preliminary injunction.**

Irreparable harm is a necessary threshold for awarding preliminary injunctive relief. Preliminary injunctions are a strong medicine, and they should not be issued merely to calm the imaginings of the movant. Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004). A preliminary injunction should not be issued except to prevent a real threat of harm. Ross-Simons, 102 F.3d at 19; 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948.1, at 153-54 (2d ed. 1995). A threat that is either unlikely to materialize or purely theoretical will not do. Ross-Simons, 102 F.3d at 19; Pub. Serv. Co. v. Town of W. Newbury, 835 F.2d 380. 382 (1st Cir. 1987). If a case can be adjudicated on the merits before the harm complained will occur, there is no sufficient justification for preliminary injunctive relief. 11A Wright, Miller & Kane, §2948.1 at 149. The irreparable harm must be "neither remote nor speculative, but actual and imminent". In re Bora Bora, Inc., 424 B.R. 17, 26 (Bankr. D.P.R. 2010).

The Supreme Court has frequently reiterated that the standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Los Angeles v. Lyons, 461 U.S. 95, 103 (1983). Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. Mazurek v. Armstrong, 520 U.S. 968 (1997) (*per curiam*). In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co. v. Village of Gambell, Ak, 480 U.S. 531, 542 (1987).

In most cases, irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief. Irreparable harm is "an essential prerequisite" for receiving such

redress. The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (Internal citation omitted). A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store. Regan v. Vinick & Young (In re Rare Coin Galleries of Am., Inc.), 862 F.2d 896, 902 (1st Cir. 1988). An injunction should issue only where the intervention of a court of equity "is essential in orders effectually to protect property rights against injuries otherwise irremediable." Cavanaugh v. Looney, 248 U.S. 453, 456 (1919).

In the case at bar, Plaintiffs utterly failed to specify the factual allegations of irreparable harm needed to clear the threshold of an award of preliminary injunctive relief. In their request for preliminary injunction, Plaintiffs plead that should the Demographic Registry's policy and practice be sustained, they would lose their right to identify themselves freely. (Docket No. 3, p. 6). However, as discussed in Defendants Motion to Dismiss, the Department of Health's policy and practice does not bar Plaintiffs' expressive conduct. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as nonbinary persons and aligning it with their gender identity. Plaintiffs are currently free to identify themselves freely and therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied. Moreover, "X" gender markers have been available for U.S. Passports since April 11, 2022, but only one of the six plaintiffs has obtained it. (Docket Nos. 12-4 to 12-9). Therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied.

Should the court issue a preliminary injunction while it proceeds on the merits of the case, it would create a displacement in the Department of Health's database. The Department's policy and practice helps make the Demographic Registry's data useful for other agencies. Adding a third gender marker may burden other state agencies since all the agencies in Puerto Rico accommodate only two sexes, and including a third may complicate searches, burdening other agencies that use the Demographic Registry's data and therefore causing irreparable harm.

**C. The balance of equities and the effect of the Court's ruling on the public interest undisputedly tip the balance in favor of denying preliminary injunctive relief.**

The Supreme Court of the United States has stated that the final two factors, "assessing the harm to the opposing party and weighing the public interest" typically "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Accordingly, the Court should analyze these factors together. A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests. Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004). Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as well as the substance of the legal issues it presents. See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 24 (2008). The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981).

In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co., 480 U.S. at 542. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barceló, 456 U.S. 305, 312 (1982). Thus, "[a]n injunction should issue only where the

17

intervention of a court of equity is essential to effectually protect property rights against injuries otherwise irremediable." Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011). This involves weighing "the balance of relevant hardships as between the parties." Vaquería Tres Monjitas, Inc., v. Irizarry, 587 F.3d 464, 482 (1st Cir. 2009). The Courts must balance "the hardships that will befall the nonmovant if the injunction does not issue." Mercado-Salinas v. Bart Enterprises Int'l, Ltd., 671 F.3d 12, 19 (1st Cir. 2011). A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

It is in the public interest to have an understandable demographic registry that can provide useful data for other agencies. To minimize confusion, the Department of Health has a public interest in making this data useful for other agencies. The Department's policy and practice of keeping the system in the female and male binary enhances the ability to verify identities and limit unnecessary mismatches. Moreover, including a third sex designation may burden other agencies who use the Demographic Registry's data since the current state of law in Puerto Rico is limited to two sexes, male and female. Additionally, should the court issue a preliminary injunction, it would require that the Department of Health incur in programming costs, design and modification of its systems which would require time and monetary resources. Therefore, it is in the public's best interest that the preliminary injunction be denied.

## III.    CONCLUSION

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive branch of the government. The executive branch contemplates the authority to execute, carry out, and enforce the laws. The executive branch does not make the laws in the first instance. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952)

("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without legislation to that effect or a court order.

Notwithstanding, Plaintiffs' allegations do not meet any of the necessary requirements that must be established for the issuance of such an extraordinary relief, the preliminary injunction. First, Plaintiffs are unlikely to succeed on the merits because of the arguments espoused in the Motion to Dismiss, adopted by reference as if fully set forth herein and discussed in this Opposition. Second, Plaintiffs have failed to set forth an irreparable harm. Plaintiffs are currently free to identify themselves freely and therefore, no irreparable harm stemming from their alleged right to identify themselves will happen if the preliminary injunction is denied. Lastly, it is in the public interest that the Demographic Registry maintains an integrated system where other state agencies may collect data, verify identities, and limit unnecessary mismatches. Given the extraordinary nature relief requested by Plaintiffs, it is respectfully pleaded that this court maintains the status quo and deny the request for preliminary injunction.

**WHEREFORE**, appearing Defendants respectfully request that the court deny Plaintiffs' Request for a Preliminary Injunction and dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 18th day of March 2024.

19

**DOMINGO EMANUELLI-HERNÁNDEZ**
Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Deputy Secretary in Charge of Civil Litigation

**MARCIA I. PÉREZ-LLAVONA**
Director of Legal Affairs
Federal Litigation and Bankruptcy Division

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE
OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

20