IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Ínaru Nadia de la Fuente Díaz, et als.<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, et als.<br>*Defendants* | Civil No. 23-cv-1544 (MAJ)<br><br>COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEFS |

OPPOSITION TO MOTION TO DISMISS

To the Honorable Court:

In their Motion to Dismiss for Failure to State a Claim [Dkt. 17], Defendants rightly explain the judicial doctrine advanced in *Twombly*: courts must not dismiss a complaint if there is a "plausible entitlement to relief". However, their contention is that defendants, by following the "Department of Health policy and practice" did not act against plaintiffs' constitutional rights. They argue that they are bound to follow the legislature mandate that the only generic recordings be male or female, for which reason transgender persons who identify as male or female can receive a change of sex/gender in their birth certificate[1]. They advance a distinction regarding the Demographic Registry: "[it] contains the official version of

---

[1] Let's remember that this action has been the result of case *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018), which ordered these same officials to record the change, an action that had been previously denied to them, forcing the petition to this Court in 2017. As the Court certainly remembers, at the time *Arroyo González* was filed, the Department of Transportation and Public Works had already allowed the change of gender in their identifications, following the issuance of the Commonwealth's public policy against trans discrimination. [Executive Order OE 2015-29].

the existence, civil status and vital facts of the people born in Puerto Rico". Although the Complaint clearly alleges infringement of the Fourteenth Amendment's Substantive Due Process, Equal Protection and the First Amendment, they argue that plaintiffs' did not "plead a cognizable claim of liberty or property interest", that under the Equal Protection sex-based discrimination test they have a reasonable reason in "protecting the integrity and accuracy of vital records" by "maintaining a binary system for the purpose of collecting information" and that birth certificates — being governmental speech— do not trigger the First Amendment guarantees. Most of these arguments are a rehash of arguments already dismissed in *Arroyo González v Roselló*, 305 F. Supp. 3rd, 327 (D.P.R. 2018). Nonetheless, we again present to the Court the appropriate legal standard in this case.

The facts in the Second Amendment Complaint are straightforward:

1. All plaintiffs are non-binary transgender individuals.

2. One of them, Inaru Nadia de la Fuente, has already obtained a U.S. passport that identifies their gender as X. All other plaintiffs will identify their gender as X in the U.S. passport.

3. After the decision in *Arroyo González v Roselló,* the Commonwealth's Registry issued the procedure that guides the change of gender: Submit <u>one</u> of the following documents: 1) driver license showing change in gender; 2) passport showing change in gender; 3) certification issued by a health or behavior professional attesting to the patient's gender. See Dkt. 12-1.

4. On April 2022, the Department of State began to issue U.S. passports with an X marker.

5. The Commonwealth's Registry does not include an X marker.

6. On 2023 the Registry denied plaintiffs' request to amend the forms to include the X marker so that they can obtain a birth certificate that adequately represents their gender, in compliance with the Registry's published instructions.

7. The Complaint alleges that the denial to include an X marker for nonbinary gender violates the Fourteenth Amendment, the Equal Protection Clause and the First Amendment.

DISCUSSION

> The right to identify our own existence lies at the heart of one's humanity.
> Judge Carmen Cerezo, 2018

A. GENDER IDENTITY

The issue before this Court, although new to this District, has been addressed by other courts: what is the correlation between the terms *sex* and *gender*. See *Matter of Hollister*, 305 Or. App. 368 (2020) [granting a change in the birth certificate from female to nonbinary]. First, since historically the word *gender* had been used as a close synonym of the word *sex*, it is no surprise that the Supreme Court found that discrimination based on *gender* is discrimination based on *sex*. See *Bostock v Clayton, Georgia*, 590 U.S. 644 (2020) [Title VII case] . Consequently, in *Bostock* the Court recognized that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex". Id at 660. The reasoning is that "[a]n employer who fires an individual for being homosexual or

3

transgender fires that person for traits or actions it would not have questioned in members of a different sex. Id at 651-652. Here the court is obviously referring to the behavioral, cultural, or psychological traits typically associated with one sex, or "gender roles." See *Miriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/gender; retrieved March 2024.

By the middle of the XX<sup>th</sup> century, the concept of *gender* began to transcend the dichotomy male/female. See *Mirriam Webster*, at "Are *gender* and *sex* the same? Usage Guide". The new usage is now recorded in the *Cambridge Dictionary's* definition of *gender* as "a group of people in a society who share particular qualities or ways of behaving which that society associates with being male, female, <u>or another identity</u>". https://dictionary.cambridge.org/dictionary/english/gender; retrieved March 2024 [emphasis provided]. The Courts that have recently faced controversies regarding "gender identity" have recognized that this term not only refers to the binary male/female, but to other identity constructions beyond the binary. For example, in *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023) the Court defined *gender identity* as "the term used to describe a person's sense of being male, female, neither, <u>or some combination of both</u>" [emphasis provided], following the up-to-date medical and professional conception of the term *gender*:

> the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for different genders. In a human context, the distinction between gender and sex reflects the usage of these terms: Sex refers to the biological status of being male, female, or intersex, whereas gender implies the psychological, behavioral, social, and cultural aspects of gender (i.e., masculinity, femininity,

4

nonbinary, nonconforming, or other gender)." *APA Dictionary of Psychology*, https://dictionary.apa.org/gender, retrieved March 2024.

B. APPLICABLE LAW

"'No right,' in this Court's time-honored view, 'is held more sacred, or is more carefully guarded,' than 'the right of every individual to the possession and control of his own person'." *Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022), citing *Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) [dissenting opinion of Breyer, Sotomayor and Kagan]. Matters involving the most intimate and personal choices a citizen may make in a lifetime, choices central to personal dignity and autonomy, [*e.g.* marriage, contraceptives, child rearing, procreation, denial of medical treatment, decisions about education, decisions involving where to reside or with whom to have sex], "are inherent to the liberty protected by the Fourteenth Amendment. See *Cook v Gates*, 528 F. 3d 42 (1st Cir. 2008) for a discussion of cases. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González*, supra, at 333, quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) [*rev.* on other grounds[2]]. All of the Supreme Court's decisions regarding the right to liberty of the Fourteenth Amendment were recognized "as —'the most intimate and personal' a person can make, —reflect fundamental aspects of personal identity; they define the very "attributes of personhood". *Dobbs*, supra, dissenting

---

[2] *Dobbs'* majority was adamant that their decision only affected women's right to abortion and not other rights based on the same rationale. They based the distinction in the fact that abortion deals with an unborn life, whereas all other cases dealt with personal or individual interests.

5

opinion at 380. We believe that none of those aspects are more personal than the decision of self identification, the construction of our own self as persons. As recognized by Justice Kennedy, "[t]he Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell v Hodges*, 576 U.S. 644, 652 (2015).

In *Obergefell*, the Court engaged in a discussion of the liberty aspect of the Fourteenth Amendment and its treatment by the Supreme Court: "these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. Id at 653, quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965). The decision advises that, as part of the judicial duty to interpret the Constitution, the courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." Id at 664.

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. *Id.*

Here and now, as happened in *Obergefell v Hodges, supra,* and *Lawrence v Texas*, 539 U.S. 558 (2003) this Court is confronted with new terms and ideas that have been just recently developed, not

only because of changes in the theoretical conception of society and its constituents, but because of medical and scientific developments. "The Court, like many institutions, has made assumptions defined by the world and time of which it is a part." *Obergefell* at 665.

One such assumption is that there are only two sexes and, thus, two genres corresponding to them. But, as recent literature and even court cases attest, studies have proven that *gender* is a separate category from *sex* and it does not correspond to the binary system of male/female. See *Matter of Hollister*, *supra*. "[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell* at 673. Contrary to Defendants contention,

> [t]he dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act. *Obergefell* at 677.

As *Obergefell* did when examining lesbian and gays' claim that denying them the right to marriage was unconstitutional, this Court must examine if Plaintiffs have a liberty interest in their self identification as nonbinary, in light of all new developments in science and the recognition of an identity beyond the binary male/female. The answer, following the jurisprudence discussed previously, should be YES.

7

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike". *Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985). After *Arroyo González*, all trans binary people may change their birth certificate to show their appropriate gender identity, male or female. The Registry keeps the birth information in their archives and issues a new birth certificate to the citizen, therefore, no original information is deleted or lost. The Registry's only offered reason for not including an X in the birth certificate is that they must maintain the "integrity of the records"; "collect information"; the "study of vital statistics of our population"; "the official version of the existence, civil status and vital facts of the people born in Puerto Rico". None of these are disrupted by the addition of an X and, in fact, were discarded by Judge Cerezo. On the contrary, the Commonwealth's records would be more truthful if they were to maintain records of nonbinary people too, as well as intersex people[3]. Moreover, after *Arroyo González*, the Registry has in place a procedure to maintain the birth information of trans people intact while giving a new birth certificate with the changed gender, that is, the gender that is real at the moment of the issuance of the certificate.

---

[3] In fact, the record of intersex individuals is vital for medical and sociological research, but the Registry has refused to keep those records, probably because of an outdated idea of intersex as a malformation or disease. For example, if a person born with physical intersex characteristics wanted to keep their body unchanged in the manner it was when born, the Commonwealth's Registry would deny such person a right to their own bodily integrity. In fact, they would force the person to chose one sex over the other, regardless of their physical traits.

It is telling that the Legislature added a second paragraph to Art. 694 of the 2020 Civil Code after *Arroyo González,* instead of rewriting the statute. While the first paragraph exclusively uses the term *sex*, the second paragraph exclusively uses the word *gender*[4]. In a very similar case, *Matter of Hollister*, supra, the Oregon Court declined to engage the constitutional challenges —the same raised in this case— because the Judge deemed that a simple statutory interpretation would suffice to decide that plaintiff had a right to change their birth certificate to nonbinary. The Judge concluded his analysis of the terms *sex* and *gender identity* in the Oregon statute affirming:

> Given, then, that an applicant's gender identity is the basis for the applicant's legal change of sex, it logically follows that, under ORS 33, 460, legal sex designations cannot be limited to "male" or "female". The statute's requirement that the legal sex designation correspond to the applicant's affirmed gender identity strongly suggests that the option of "nonbinary" be available as a choice.  Id at 377.

The Commonwealth's hermeneutic rule, as the Defendants have already pointed out in their Motion, is that statutes are understood by reading the letter of the law, giving words the

---

[4] "No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.
Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy." 31 P.R. Laws ann. tit. 31 §7655.

meaning they commonly have in the appropriate context. When the Legislature used the term *gender* in the second paragraph instead of *sex*, it acknowledge and adopted the difference between those two terms, following *Arroyo González*[5]. All proffered reasons for not adding an X marker have vanished under *Arroyo González* and the 2020 *Civil Code*. The only reason to make a distinction between binary and nonbinary trans people is an improper animus: the disapproval of the second class. "The Constitution's guarantee of equality 'must at the very least mean that a bare [...] desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *U.S. v Windsor*, 570 U.S. 744, 770 (2013).

    The clear mandate of the 2020 Civil Code is that, notwithstanding all previous prohibitions contained in the Registry's Act, any person can change their gender by presenting a Passport or a driver's license that designate their gender differently to the sex recorded in the Registry. Once plaintiff De la Fuente presented his passport with an X gender-marker, the Registry was bound, under Puerto Rico's law, to include that designation in their records. Nothing in Art. 684 defeats that literal interpretation. Once De la Fuente follows all published procedures and presents their U.S. Passport, the Registry has a legal duty to add an X marker to include their gender.

---

[5] We acknowledge that *Arroyo González* was a case whose plaintiffs were all binary trans and, therefore, they assumed a gender within the boundaries of that dichotomy. Nonetheless, by recognizing the difference between sex and "assumed gender" it fundamentally changed the nature of the Demographic Registry, which now may contain two separate informations: the sex at birth and the gender.  The Legislature accepted this new form of keeping records and approved that a person change its gender marker in the Registry.

This is the reason why Defendants are mistaken when they discuss the requirements to raise a constitutional challenge of a statute. Plaintiffs contention is that, after *Arroyo González* and the amendment to Cc art. 694 , both the courts and the Legislature have recognized *gender* as a separate construction of *sex* and have allowed for the change of *gender* in the birth certificate according to the person's gender identity. After 2020, there is no statutory reason for denying Plaintiffs' petition.

C. Scrutiny

The substantive component of the due process of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v Glucksberg*, 521 U.S. 702, 720 (1997).   "[A]ll gender-based classifications… warrant heightened scrutiny." *U.S. v Virginia*, 518 U.S. 515, 555 (1996). As discussed in *Cook*, supra, all cases that conceived people's personal decisions regarding sexual conduct as a liberty interest have been decided under the heightened judicial scrutiny. Id at 52.

Similarly, "[u]nder equal protection jurisprudence, a governmental classification aimed at a "suspect class" is also subject to heightened judicial scrutiny. *Cook* at 61. Following *Bostock*, a classification denying nonbinary persons a change of gender in the birth certificate is a determination "based on sex", because it's based on the assumption that all people must conform to the binary male/female and nonbinary people do not identify with neither. "[A]s gender classifications "generally provide[ ] no sensible ground for differential treatment," *id.*, "

'all gender-based classifications today' warrant 'heightened scrutiny.' " *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023), quoting *United States v. Virginia* , 518 U.S. 515, 555 (1996) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994).

However, the heightened scrutiny that applies to gender is the intermediate scrutiny. "Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification "be substantially related to an important governmental objective."" *Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015), as amended (Feb. 2, 2016), quoting *Clark v. Jeter,* 486 U.S. 456 (1988).  See *Cook*, supra, at 56 [stating that Lawrence, supra, identified a liberty interest in consensual adult same-sex sex but applie[d] a standard of review that lies between strict scrutiny and rational basis: if the State had a legitimate interest adequate to justify the intrusion on liberty.]

Defendants refusal to include an X marker would certainly fail both strict and intermediate scrutiny. But it also would fail a rational review. As we have discussed *ante*, there is not even a rational basis for not including an X marker.  Under the rational review, "the focus is entirely on the rationality of the states's reason for enacting the law", that is, the reason cannot be invalid or wholly irrelevant to the achievement of the State's goal. *Cook*, supra at 55. "Moral disapproval of this group [homosexuals], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Fourteenth Amendment." *Lawrence v Texas*, 538 U.S. 558, 582 (2003).  Once plaintiffs have proven that the

purported basis for not including an X for gender is a mere excuse —since keeping records of the birth sex is readily achieved by the Registry's internal protocols already in place after *Arroyo González*—, this Court must vindicate plaintiffs' right to self expression in the Registry even under a rational review.

Finally, the Registry's denial in allowing plaintiffs to use a certification that is truthful in terms of their gender identity constitutes "compel speech" because it forces plaintiffs to lie in their gender identification and because they will eventually have diverse official documents recording disparate genders. This matter of law was already discussed and settled in *Arroyo González*, so that no further discussion is required.

WHEREFORE it is respectfully requested from this Honorable Court to deny dismissal.

CERTIFICATE OF SERVICE

It is hereby certified that this motion was filed electronically and a true and exact copy of the foregoing will be served on the defendants by the Pacer system.

In San Juan, Puerto Rico this 20th day of March, 2024.

S/ Johanna M. Emmanuelli Huertas
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@mac.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499