IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| Ínaru Nadia de la Fuente Díaz, et als.<br>*Plaintiffs*<br><br>vs<br><br>Pedro Pierluisi, et als.<br>*Defendants* | Civil No. 23-cv-1544 (MAJ)<br><br><br>COMPLAINT FOR<br>DECLARATORY, INJUNCTIVE<br>AND OTHER RELIEFS |
| --- | --- |

MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE COURT:

Come now plaintiffs, to move the Court to issue a Summary Judgment, and argue as

follows:

LIST OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)............................................5

*Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018) ...............................3,7

*Bostock v Clayton, Georgia*, 590 U.S. 644 (2020) ..................................................6,14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)......................................................4

*Clark v. Jeter,* 486 U.S. 456 (1988) ..........................................................................14

*Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985) ...........................10

*Cook v Gates*, 528 F. 3d 42  (1st Cir. 2008) ...........................................................7,14

*Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022).....................7

*Doe v. Town of Plymouth* , 825 F.Supp. 1102, 1107 (D. Mass. 1993).....................1514

*Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972) ...........................................................8

*Fowler v State* 104 F. 4th 770 (2024) .......................................................................12

*Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965)...............................................8

*Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015) ............................14

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) ...................................................6,12,14

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994) .........................................14

*Lawrence v Texas*, 539 U.S. 558 (2003)................................................................9,15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ................4

*Matter of Hollister*, 305 Or. App. 368 (2020)....................................................5,9,10

*Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022) .......................................................10

*Obergefell v Hodges*, 576 U.S. 644, 652 (2015).......................................................8,9

*Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992)...................7

*Romer v. Evans*, 517 U.S. 620, 634 (1996) .............................................................12

*Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) ..........................................7

*U.S. v Virginia*, 518 U.S. 515, 555 (1996).........................................................13,14

*U.S. v Windsor*, 570 U.S. 744, 770 (2013)............................................................ 12

*Washington v Glucksberg*, 521 U.S. 702, 720 (1997)................................................ 13

*Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022)...................................................... 11

FRCP 56 ............................................................................................................4

2020 Civil Code, Art. 694, 31 P.R. Laws ann. tit. 31 §7655 .............................10,13

Executive Order OE 2015-29 ........................................................................... 2,3

*Miriam Webster Dictionary*,

https://www.merriam-webster.com/dictionary/gender;

retrieved March 2024 .......................................................................................6

Cambridge Dictionary

https://dictionary.cambridge.org/dictionary/english/gender ................................6

*APA Dictionary of Psychology*,

https://dictionary.apa.org/gender, retrieved March 2024 .....................................7

UNCONTROVERTED FACTS

1. Application for Gender Change in Vital Event Certification requires that applicant submit <u>one</u> of the following documents: (i) Driver's license showing change in gender; (ii) Passport showing change in gender; (iii) Certification issued by a health professional or behavior professional who has a Physician-Patient relationship with the applicant. [Admitted in Answer]

2. The Application for Gender Change only includes two gender markers: male and female. [See form, Appendix 12-1]

3. The Commonwealth's Registry does not include an X marker or any other such marker beyond male and female. [Id]

4. The *APA Dictionary of Psychology* recognizes nonbinary as a category of gender. [*APA Dictionary of Psychology*, https://dictionary.apa.org/gender, retrieved March 2024]

5. Although the Vital Registry's Act prohibits the changes to the birth certificate in custody of the Division of Demographic Registry and Vital Statistics of the Commonwealth, an amendment following *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018) specifically states that "[N]othing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy." 31 P.R. Laws ann. tit. 31 §7655.

6. The Department of State of the Unites States of America issues U.S. passports with an X marker. [See https://travel.state.gov/content/travel/en/passports/need-passport/selecting-your-gender-marker.html]

7. In 2023 the Registry denied plaintiffs' request to amend the forms to include the X marker so that they can obtain a birth certificate that adequately represents their gender, in compliance with the Registry's published instructions. [See Dkt. 12-3]

8. Plaintiff Ínaru Nadia de la Fuente Díaz identifies as a nonbinary person who lives in San Juan, whose passport identifies them with an X marker as their gender. [Statement under Penalty of Perjury, Dkt.12-4]

9. Maru Rosa Hernández is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-5]

10. André Rodil identifies as a nonbinary person and lives in San Juan, as submitted with their Statement Under the Penalty of Perjury [Statement under Penalty of Perjury, Dkt. 12-6].

11. Yelvy Vélez Bartolomei is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-7]

12. Gé Castro Cruz is a nonbinary person living in San Juan. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-8]

13. Deni Juste is a nonbinary person living in Moca. They is currently employed. [Statement under Penalty of Perjury, Dkt. 12-9]

14. An individual's birth certificate is a primary identification document. In Puerto Rico, it is needed to obtain a driver's license, a marriage license, a U.S. passport, a Social Security card, a voting card, and generally as proof of identification to conduct banking transactions and other business. [See Finding of Fact 13 in *Arroyo González*]

15. Birth certificates in Puerto Rico indicate a person's birth-assigned sex based on the appearance of genitalia rather than their actual sex, as determined by their gender identity and lived experience. [See Finding of Fact 15 in *Arroyo González*]

16. Individuals whose gender identity falls within these traditionally recognized confines of " male" and "female" are "binary." Both cisgender people (those whose gender identity matches the sex they were assigned at birth) and transgender people (those whose gender identity does not match the sex assigned at birth) can have a binary gender of male or female. [Admitted in Answer # 22]

17. Transgender people are people who have a gender identity that is different from the gender they were assigned at birth. [Admitted in Answer # 25]

18. Gender identity is a person's internal sense of their own gender. [Admitted in Answer, #29]

19. The incongruence between a transgender person's gender identity and sex assigned at birth is associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013)("DSM–V"). [See Finding of Fact 20 in *Arroyo González*]

20. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's sex assigned at birth. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, and suicidal ideation or even self-harm. [See Finding of Fact 21 in *Arroyo González*]

21. On November 14, 2008, the Commonwealth of Puerto Rico (the "Commonwealth") issued Executive Order OE–2008–57 that established as a matter of public policy the prohibition of discrimination in the provision of public services. It applies to all public agencies and instrumentalities, including the Demographic Registry of Puerto Rico. Such

sweeping outlawed discrimination in all forms, including gender identity. [See Finding of Fact 33 in *Arroyo González*]

## INTRODUCTION

This action is the result of case *Arroyo González v Rosselló*, 305 F.Supp.3d 327 (D.P.R. 2018), which ordered these same defendants officials to record a change in gender, an action that had been previously denied to them, forcing the petition to this Court in 2017. At the time *Arroyo González* was filed, the Department of Transportation and Public Works had already allowed the change of gender in their identifications, following the issuance of the Commonwealth's public policy against trans discrimination. [Executive Order OE 2015-29]. This case is based on the same grounds: gender is a social construct that, upon imposition by the Government upon individuals, violates their right to be free of the State's imposition of gender *in lieu* of their self identification as non-binary.

In their filings before the Court, Defendants advance a distinction between *Arroyo González* and this petition regarding the Demographic Registry: "[it] contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico" and that the Registry protects "the integrity and accuracy of vital records" by "maintaining a binary system for the purpose of collecting information". Therefore, this Court must address a novel issue in this District: if maintaining a binary system to identify individuals violates the Fourteenth Amendment, the Equal Protection Clause and the First Amendment.

## DISCUSSION

The right to identify our own existence lies at the heart of one's humanity.

Judge Carmen Cerezo, 2018

A. Legal Standards for  Summary Judgment under Rule 56

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists or shows that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at

4

586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587.

B.  GENDER IDENTITY

The issue before this Court, although new to this District, has been addressed by other courts: what is the correlation between the terms *sex, gender and the binary system based on sex*. See *Matter of Hollister*, 305 Or. App. 368 (2020) [granting a change in the birth certificate from female to nonbinary]. First, since historically the word *gender* had been used as a close synonym of the word *sex*, it is no surprise that the Supreme Court found that discrimination based on *gender* is discrimination based on *sex*. See *Bostock v Clayton, Georgia*, 590 U.S. 644

(2020) [Title VII case] .  Consequently, in *Bostock* the Court recognized that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex".  Id at 660. The reasoning is that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Id at 651-652. Here the court is obviously referring to the behavioral, cultural, or psychological traits typically associated with one sex, or "gender roles." See *Miriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/gender; retrieved March 2024.

By the middle of the XX<sup>th</sup> century, the concept of *gender* began to transcend the dichotomy male/female. See *Mirriam Webster*, at "Are *gender* and *sex* the same? Usage Guide". The new usage is now recorded in the *Cambridge Dictionary's* definition of *gender* as "a group of people in a society who share particular qualities or ways of behaving which that society associates with being male, female, <u>or another identity</u>". https://dictionary.cambridge.org/dictionary/english/gender; retrieved March 2024 [emphasis provided]. The Courts that have recently faced controversies regarding "gender identity" have recognized that this term not only refers to the binary male/female, but to other identity constructions beyond the binary. For example, in *Hecox v. Little*, 79 F.4th 1009, 1016 (9th Cir. 2023) the Court defined *gender identity* as "the term used to describe a person's sense of being male, female, neither, <u>or some combination of both</u>" [emphasis provided], following the up-to-date medical and professional conception of the term *gender*:

> the socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for different genders. In a human context, the distinction between gender and sex reflects the usage of these terms: Sex refers to the biological status of being male, female, or intersex, whereas gender implies the psychological, behavioral, social, and cultural aspects of gender (i.e., masculinity, femininity,

nonbinary, nonconforming, or other gender)." *APA Dictionary of Psychology*, https://dictionary.apa.org/gender, retrieved March 2024.

C. APPLICABLE LAW

"'No right,' in this Court's time-honored view, 'is held more sacred, or is more carefully guarded,' than 'the right of every individual to the possession and control of his own person'." *Dobbs v Jackson Women's Health Organization*, 597 U.S. 215, 379 (2022), citing *Union Pacific R. Co. v Botsford*, 141 U.S. 250, 251 (1891) [dissenting opinion of Breyer, Sotomayor and Kagan].   Matters involving the most intimate and personal choices a citizen may make in a lifetime, choices central to personal dignity and autonomy, [*e.g.* marriage, contraceptives, child rearing, procreation, denial of medical treatment, decisions about education, decisions involving where to reside or with whom to have sex], "are inherent to the liberty protected by the Fourteenth Amendment.  See *Cook v Gates*, 528 F. 3d 42  (1st Cir. 2008) for a discussion of cases. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González*, supra, at 333, quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851 (1992) [*rev.* on other grounds]. All of the Supreme Court's decisions regarding the right to liberty of the Fourteenth Amendment were recognized "as —'the most intimate and personal' a person can make, — reflect fundamental aspects of personal identity; they define the very "attributes of personhood".  *Dobbs*, supra, dissenting opinion at 380.  We believe that none of those aspects are more personal than the decision of self identification, the construction of our own self as persons.  As recognized by Justice Kennedy,  "[t]he Constitution promises liberty to all within

its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell v Hodges*, 576 U.S. 644, 652 (2015).

In *Obergefell*, the Court engaged in a discussion of the liberty aspect of the Fourteenth Amendment and its treatment by the Supreme Court: "these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. Id at 653, quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453, (1972); *Griswold v. Connecticut*, 381 U.S. 479, 484-486 (1965). The decision advises that, as part of the judicial duty to interpret the Constitution, the courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." Id at 664.

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed. *Id.*

Here and now, as happened in *Obergefell v Hodges, supra,* and *Lawrence v Texas*, 539 U.S. 558 (2003) this Court is confronted with new terms and ideas that have been just recently developed, not only because of changes in the theoretical conception of society and its constituents, but because of medical and scientific developments. "The Court, like many institutions, has made assumptions defined by the world and time of which it is a part." *Obergefell* at 665.

One such assumption is that there are only two sexes and, thus, two genres corresponding to them. But, as recent literature and even court cases attest, studies have proven that *gender* is a separate category from *sex* and it does not correspond to the binary

system of male/female. See *Matter of Hollister*, *supra*.  "[I]n interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell* at  673. Contrary to Defendants contention,

> [t]he dynamic of our constitutional system is that individuals need not  await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act. *Obergefell* at 677.

As *Obergefell* did when examining lesbian and gays' claim that denying them the right to marriage was unconstitutional, this Court must examine if Plaintiffs have a liberty interest in their self identification as nonbinary, in light of all new developments in science and the recognition of an identity beyond the binary male/female.   The answer, following the jurisprudence discussed previously, should be YES.

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike". *Cleburne v Cleburne Living Center, Inc.* 472 U.S. 432, 439 (1985).  After *Arroyo González*, all trans binary people may change their birth  certificate to show their appropriate gender identity, male or female. The Registry keeps the birth information in their archives and issues a new birth certificate to the citizen, therefore, no original information is deleted or lost. The Registry's only offered reason for not including an X in the birth certificate is that they must maintain the "integrity of the records"; "collect information"; the "study of vital statistics of our population"; "the official version of the existence, civil status and vital facts of the people born in Puerto Rico". None of these are disrupted by the addition of an X and, in fact, were already discarded by Judge Cerezo. On the contrary, if the purported reason were so important for government, the Commonwealth's

records would be more truthful if they were to maintain records of nonbinary people too, as well as intersex people. Moreover, after *Arroyo González*, the Registry has in place a procedure to maintain the birth information of trans people intact while giving a new birth certificate with the changed gender, that is, the gender that is real at the moment of the issuance of the certificate.

It is telling that the Legislature added a second paragraph to Art. 694 of the 2020 Civil Code after *Arroyo González,* instead of rewriting the statute. While the first paragraph exclusively uses the term *sex* and grants specific exceptions in which the birth certificate may be amended, the second paragraph exclusively uses the word *gender*. In a very similar case, *Matter of Hollister*, supra, the Oregon Court declined to engage the constitutional challenges —the same raised in this case— because the Judge deemed that a simple statutory interpretation would suffice to decide that plaintiff had a right to change their birth certificate to nonbinary. The Judge concluded his analysis of the terms *sex* and *gender identity* in the Oregon statute affirming:

> Given, then, that an applicant's gender identity is the basis for the applicant's legal change of sex, it logically follows that, under ORS 33, 460, legal sex designations cannot be limited to "male" or "female". The statute's requirement that the legal sex designation correspond to the applicant's affirmed gender identity strongly suggests that the option of "nonbinary" be available as a choice.  Id at 377.

Similarly, in *Matter of N.K.*, 174 N.Y.S. 3d 541, 543 (2022) the New York court ordered a change of the plaintiff's Georgia's birth certificate to non-binary, indicating that "the Court is unaware of any law or regulation in Georgia expressly addressing, providing for, or prohibiting such option".  Following these reasonings, we submit to this Court that, by amending the law, Puerto Rico's legislature specifically granted the previously prohibited changes and, by including, for the first and only occurrence in that statute, the word "gender",

the Puerto Rico legislature acknowledge the possibility of having to amend the birth certificate in accordance with the <u>gender identity</u> of the individual, as expressed in a U.S. passport, a driver's license issued by Puerto Rico or any other jurisdiction, or a medical certification of the person's true gender identity. Since non-binary is, indeed, a "gender identity" recognized by the medical profession, the Registry cannot proffer that they are following Puerto Rico's law while denying plaintiffs a change of gender to nonbinary, since the statute now expressly grants the option to change one's gender identification.

The Commonwealth's hermeneutic rule, as the Defendants have already pointed out in their Motion, is that statutes are understood by reading the letter of the law, giving words the meaning they commonly have in the appropriate context. When the Legislature used the term *gender* in the second paragraph instead of *sex*, it acknowledged and adopted the difference between those two terms, following *Arroyo González*.  All proffered reasons for not adding an X marker have vanished under *Arroyo González* and the 2020 *Civil Code*.

The Commonwealth's actions are more invidious, as they have now, in practice, created a classification within the trans gender identity that is nowhere found in the medical and psychological literature regarding gender identity. At present, trans people who conform to the binary distinction are recognized by the government as people whose gender identity is a fundamental right of personhood, while trans people whose identity is non binary are excluded from the rights recognized for those who are binary trans.

The only reason to make a distinction between binary and nonbinary trans people is an improper animus: the disapproval of the second class. "The Constitution's guarantee of equality 'must at the very least mean that a bare […] desire to harm a politically unpopular group cannot' justify disparate treatment of that group."  *U.S. v Windsor*, 570 U.S. 744, 770

(2013). When state action cannot be explained by a legitimate state interest, it "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer v. Evans*, 517 U.S. 620, 634 (1996). Here, the proffered rational basis of "maintaining the integrity of vital records" is, evidently, a thinly disguised excuse to exclude an X marker because the Registry already makes changes based on gender and because strict protocols already exist to maintain the integrity of the records in cases of change of gender. Defendants have offered no other basis for their exclusionary conduct. Regarding the test to evaluate purposeful discrimination met here, see *Fowler v Stitt*, pp. 787 et. seq.

The clear mandate of the 2020 Civil Code is that, notwithstanding all previous prohibitions contained in the Registry's Act, any person can change their gender by presenting a Passport or a driver's license that designate their gender differently to the sex recorded in the Registry. Once plaintiff De la Fuente presented their passport with an X gender-marker, the Registry was bound, under Puerto Rico's law, to include that designation in their records. Nothing in Art. 684 defeats that literal interpretation; on the contrary, the statue clearly lays out the procedure for a citizen to follow. Once De la Fuente follows all published procedures and presents their U.S. Passport, the Registry has a legal duty to add an X marker to include their gender.

This is the reason why Defendants are mistaken when they discuss the requirements to raise a constitutional challenge of a statute. Plaintiffs contention is that, after *Arroyo González* and the amendment to Cc art. 694 , both the courts and the Legislature have recognized *gender* as a separate construction of *sex* and have allowed for the change of *gender* in the birth certificate according to the person's gender identity. After 2020, there is no statutory basis for denying Plaintiffs' petition.

D. Scrutiny

The substantive component of the due process of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v Glucksberg*, 521 U.S. 702, 720 (1997). "[A]ll gender-based classifications… warrant heightened scrutiny." *U.S. v Virginia*, 518 U.S. 515, 555 (1996). As discussed in *Cook*, supra, all cases that conceived people's personal decisions regarding sexual conduct as a liberty interest have been decided under the heightened judicial scrutiny. Id at 52.

Similarly, "[u]nder equal protection jurisprudence, a governmental classification aimed at a "suspect class" is also subject to heightened judicial scrutiny. *Cook* at 61. Following *Bostock*, a classification denying nonbinary persons a change of gender in the birth certificate is a determination "based on sex", because it's based on the assumption that all people must conform to the binary male/female and nonbinary people do not identify with either. "[A]s gender classifications "generally provide[ ] no sensible ground for differential treatment," *id.*, " 'all gender-based classifications today' warrant 'heightened scrutiny.' " *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023), quoting *United States v. Virginia* , 518 U.S. 515, 555 (1996) and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994).

However, the heightened scrutiny that applies to gender is the intermediate scrutiny. "Intermediate scrutiny (applicable to quasi-suspect classes like gender and illegitimacy) requires that a classification "be substantially related to an important governmental objective."" *Hassan v. City of New York*, 804 F.3d 277, 298–99 (3d Cir. 2015), as amended (Feb. 2, 2016), quoting *Clark v. Jeter,* 486 U.S. 456 (1988).  See *Cook*, supra, at 56 [stating that

Lawrence, supra, identified a liberty interest in consensual adult same-sex sex but applie[d] a standard of review that lies between strict scrutiny and rational basis: if the State had a legitimate interest adequate to justify the intrusion on liberty.]

Defendants' refusal to include an X marker would certainly fail both strict and intermediate scrutiny. But it also would fail a rational review. As we have discussed *ante*, there is not even a rational basis for not including an X marker. Under the rational review, "the focus is entirely on the rationality of the State's reason for enacting the law", that is, the reason cannot be invalid or wholly irrelevant to the achievement of the State's goal. *Cook*, supra at 55. "Moral disapproval of this group [homosexuals], like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Fourteenth Amendment." *Lawrence v Texas*, 538 U.S. 558, 582 (2003). Once plaintiffs have proven that the purported basis for not including an X for gender is a mere excuse —since keeping records of the birth sex is readily achieved by the Registry's internal protocols already in place after *Arroyo González*—, this Court must vindicate plaintiffs' right to self expression in the Registry even under a rational review. "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Arroyo González* at 333. This right to self expression is intertwined with the most fundamental right of human beings: their right to exist. As Judge Cerezo advises, "'there are few areas which are closely intimate facts of a personal nature' than one's transgendered status." Id, quoting *Doe v Town of Plymouth*, 825 F. Supp. 1102, 1107 (D. Mass. 1993). Finally, the Registry's denial in allowing plaintiffs to use a certification that is truthful in terms of their gender identity constitutes "compelled speech" because it forces plaintiffs to lie in their gender identification and because they will eventually have diverse official documents recording disparate gender

markers. As Judge Cerezo stated, "Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." Id. At 333. This matter of law was already discussed and settled in *Arroyo González*, so we invoke *stare decisis* doctrine.

WHEREFORE it is respectfully requested from this Honorable Court to grant Judgment for plaintiffs.

CERTIFICATE OF SERVICE

It is hereby certified that this motion was filed electronically and a true and exact copy of the foregoing will be served on the defendants by the Pacer system.

In San Juan, Puerto Rico this 6th day of September, 2024.

S/ Johanna M. Emmanuelli Huertas
JOHANNA M. EMMANUELLI HUERTAS
USDC-PR #210506 Email: jmeh@mac.com
94 Calle Ponce, San Juan, PR 00917
Tel.: (787)342-6499