**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| ÍNARU NADIA DE LA FUENTE DÍAZ, MARU ROSA HERNÁNDEZ, ANDRÉ RODRIL, YEIVY VÉLEZ BARTOLOMEI, GÉ CASTRO CRUZ, DENI JUSTE<br><br>Plaintiffs<br><br>v.<br><br>JENNIFFER GONZÁLEZ COLÓN, in her official capacity as Governor of the Commonwealth of Puerto Rico; DR. VICTOR RAMOS OTERO, in his official capacity as the Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DÍAZ, in her official capacity as the Interim Director of the Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico.<br><br>Defendants | Civil No. 23-1544 (MAJ) |

**OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE COURT:**

**COME NOW** Defendants Hon. Jenniffer González Colón, in her official capacity as Governor of the Commonwealth of Puerto Rico; Dr. Victor Ramos Otero López in his official capacity as Appointed Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, in her official capacity as the Interim Director of the Demographic

1

Registry and Vital Statistics of the Commonwealth of Puerto Rico (hereinafter "Defendants")[1], and very respectfully STATE, ALLEGE, and PRAY as follows:

## I.    INTRODUCTION

The Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico ("Demographic Registry") records one set of information in its birth certificates, that is, biological sex based on genitalia at birth. However, after the Puerto Rico District Court's decision in <u>Arroyo González</u> v. <u>Rosselló Nevares</u>, 305 F.Supp.3d 327 (2018), the Demographic Registry was ordered to issue birth certificates to transgender individuals which reflected their gender identity, whether male or female, and not their sex assigned at birth. <u>Id</u>. at p. 334. While the current policy and practice allows for changes in the birth certificate copy, Plaintiffs would prefer to add an "X" as a nonbinary gender identity. Rather than seek to change that through the political process, Plaintiffs ask the federal judiciary to constitutionalize the contents of state birth certificates and create a third nonbinary option. But nothing in the Fourteenth Amendment provides a constitutional right to force States to record a third nonbinary gender identity option in their own records.

This Court should determine that no case or controversy exists as, considering Plaintiffs' *Statement of Uncontested Material Facts* ("SUMF"), which have been accepted by Defendants in the *Response to Plaintiffs' Statement of Uncontested Material Facts* ("RSUMF"), as well as the *Additional Statement of Uncontested Material Facts* ("ASUMF"), it is evident that the Department of Health's policy and practice of not contemplating a nonbinary gender marker, does not violate Plaintiffs' civil rights. As this court will surmise, the Equal Protection Clause provides Plaintiffs

---

[1] When the Complaint was filed, Pedro Pierluisi Urrutia was the Governor of the Commonwealth of Puerto Rico. He was automatically substituted by Governor Jenniffer González Colón on January 2nd, 2025. Likewise, at the time of the filing of the Complaint, Dr. Carlos Mellado López was the Secretary of the Department of Health. He was automatically substituted by the appointed Secretary of Health, Victor Ramos Otero. See Fed. Civ. Proc. R. 25(d). Both are sued in their official capacities.

with no such right because the Department of Health's policy and practice does not treat nonbinary persons differently than others. All Puerto Rico birth certificate records, as well as other identification documents issued by the Government, are issued under the "male" or "female" designation. Since the Legislature has not recognized a third nonbinary option identified as "X", birth certificates may be amended only in those instances recognized in the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §7655 and the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 et seq. An "X" gender marker has not been legislated nor is recognized by any other agency or office in the Government of Puerto Rico. "In interpreting an essentially unmendable constitution, the federal courts must be careful about freezing in time just one new approach to a difficult policy issue, particularly one that is steadily evolving and one that turns on each State's plenary power to decide how to speak for itself about the matter." Gore v. Lee, 107 F. 4th 548 (6th Cir. 2024).

Moreover, even if arguendo there was a different treatment for persons who identify as nonbinary, such a challenge would still satisfy constitutional review since transgender discrimination claims are evaluated under a rational basis review. L.W. v. Skrmetti, 83 F. 4th 460, 486-487 (6th Cir. 2023). If special accommodations for nonbinary persons are to be required on birth certificates, they have to come from positive law and not through the Equal Protection Clause. Bd. of Trustees v. Garrett, 531 U.S. 356, 368 (2001). And here, it is uncontested that the Department of Health's policy and practice satisfies the rational basis standard.

Further, Plaintiffs have not shown a long history and tradition of protecting a right to amend their sex designation on a birth certificate to reflect a nonbinary gender identity or that that such right is fundamental to the scheme of ordered liberty that would classify Defendants' actions as a due process clause violation under the Fourteenth Amendment. Finally, the Department of

Health's policy does not violate Plaintiffs' First Amendment rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. Since there is no factual controversy in the instant case, in light of Plaintiffs' SUMF accepted in Defendants' RSUMF and Defendants' ASUMF, the Court must deny Plaintiffs' *Motion for Summary Judgment* and, as a result, grant the instant *Cross Motion for Summary Judgment,* dismissing the *Second Amended Complaint* with prejudice.

## II.    PROCEDURAL BACKGROUND

On November 15, 2023, Plaintiffs filed a *Second Amended Complaint* challenging Puerto Rico's birth certificate policy and practice which recognizes only male and female identifications. (Docket No. 12, pp. 13-19).[2] With their initial *Complaint*, Plaintiffs filed a *Motion for Preliminary Injunction* under § 1983 (Docket No. 3). They claim that the Government's historical policy and practice, which does not include an "X" gender marker, disallows individuals who identify as transgender nonbinary from correcting their gender marker on their birth certificate to "X" and violates their Fourteenth Amendment's right to privacy and Equal Protection and their First Amendment Right to freedom of speech. Id.

On January 22, 2024, Defendants filed a *Motion to Dismiss for Failure to State a Claim*. (Docket No. 17). Essentially, they argued that, taking as true the allegations in the *Second Amended*

---

[2] Plaintiffs request this Honorable Court to: (i) rule that the Government's actions and their enforcement of the Puerto Rico Birth Certificate policy violate the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the Free Speech Clause of the First Amendment of the United States Constitution; (ii) permanently enjoin Defendants from enforcing the Puerto Rico Birth Certificate policy, which includes refusing to provide birth certificates to transgender nonbinary persons that accurately reflect their gender identity; (iii) permanently enjoin Defendants from relying upon its male-or-female, binary-only gender marker policy and issue corrected birth certificates consistent with Plaintiffs' nonbinary gender identity; (iv) order Defendants to permit transgender nonbinary persons born in Puerto Rico to correct their birth certificates to reflect their sex, consistent with their gender identity; (v) issue a writ of *mandamus* compelling Defendants to process Plaintiffs' application for gender change; and (vi) award Plaintiffs costs and attorney fees and other relief that the Court deems proper. (Docket No. 12, pp. 20-21). The Second Amended Complaint did not alter the substance of the original allegations.

*Complaint*, Plaintiffs' federal claims under the First and Fourteenth Amendments fail as a matter of law. Defendants also filed an opposition to their request for preliminary injunction and argued that Plaintiffs failed to establish the required four (4) elements for such an extraordinary remedy. (Docket No. 28). On September 23, 2024, the Court entered an *Opinion and Order* denying Plaintiffs' *Motion for Preliminary Injunction* as well as Defendants' *Motion to Dismiss for Failure to State a Claim* by stating that this is an issue of first impression. (Docket No. 39, pp. 2-3).

On September 6, 2024, Plaintiffs filed a *Motion for Summary Judgment* arguing that the Department of Health's policy and practice of issuing birth certificates with a sex or gender classification of male or female exclusively violates the Fourteenth Amendment, the Equal Protection Clause, and the First Amendment. (Docket No. 36).

Defendants will argue in this opposition to summary judgment that the Department of Health and the Demographic Registry are not authorized by law to issue a birth certificate with a sex marker other than male or female. Any change to the Department of Health's policy and practice as well as its historical use and customs has to be implemented by legislation. The Court cannot usurp the legislature's powers and duties by granting such requests.

Moreover, Plaintiffs failed to show that there is a long history and tradition of protecting a right to amend sex designations on a birth certificate to reflect a nonbinary gender identity or that such right is fundamental to the scheme of ordered liberty that would classify Defendants actions as a due process clause violation under the Fourteenth Amendment. Also, Plaintiffs fail to show how the Department of Health's policy and practice violates the Equal Protection Clause on the basis of sex. Finally, the Department of Health's policy and practice does not violate Plaintiffs' First Amendment Rights because the Government does not restrict their ability to express and present themselves in alignment with their gender identity. As a result, the Court must consider

Plaintiffs' well pleaded SUMF as well as Defendants' ASUMF and deny Plaintiffs' *Motion for Summary Judgment,* grant Defendants' *Cross Motion for Summary Judgment* and dismiss the *Second Amended Complaint* with prejudice.

### III.    STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). Fed. R. Civ. P. 56(b) provides that a party against whom a claim is asserted "may, at any time, move with or without supporting affidavits for summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(c) further states that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." The First Circuit has stated that "[O]ne of the principal purposes of the Summary Judgment rule is to isolate and dispose of factually unsupported claims or defenses." Wynne v. Tufts University School of Med., 976 F. 2d 791, 794 (1st Cir. 1992). Summary Judgment exists to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. Id.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party properly supports a motion for summary judgment, "the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v.

6

Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citing Novellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)).

Local Rule 56 governs the factual assertions made by both parties in the context of summary judgment. Loc. Rule 56; Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007). The Rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008). Pursuant to Rule 56, the movant must submit factual assertions in "a separate, short and concise statement of material facts, set forth in numbered paragraphs," and "[e]ach fact asserted in the statement shall be supported by a record citation as required by subsection (e) of this rule." Loc. Rule 56(b). The Court "disregard[s] any statement of fact not supported by a specific citation to record material properly considered on summary judgment." Loc. Rule 56(e). While the facts that are properly supported shall be deemed admitted unless properly controverted, the First Circuit has repeatedly "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]" which are designed to function as a means of focusing the district court's attention on what is and what is not genuinely controverted. Mercado-Reyes v. City of Angels, Inc., 295 F. Supp. 3d 74 (D.P.R. 2018). The Court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts. Loc. Rule 56 (e).

In opposing summary judgment, the nonmoving party may not rest upon the mere allegations or denials of its pleadings but must set forth specific facts showing that there is a genuine issue of material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." See Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir.

2013). Although "the district judge must eye all reasonable inferences in the light most congenial to the nonmoving party," the latter's evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve at an ensuing trial." Mack v. Great Atlantic and Pacific, 871 F.2d 179, 181 (1st Cir. 1989).

Even though there are no material factual controversies in dispute, Plaintiffs' Motion for Summary Judgment fails to meet the standard established by the Federal Rules of Civil Procedure as well as Local Rule 56. Plaintiffs' SUMF fail to include specific citation of record material. (*See SUMF ¶¶ 1, 4, 21; RSUMF ¶¶ 1, 4, 21*). Additionally, Plaintiffs' SUMF are not statements of facts based on the instant case, but a finding of facts and legal conclusions based on the specific facts in Arroyo Gonzalez v. Rosselló Nevares, 305 F. Supp. 3d 327 (D.P.R. 2018) (*See*, *SUMF ¶¶ 5, 14, 15, 19-21; RSUMF ¶¶ 5, 14, 15, 19-21*). As a result, Plaintiffs' objected SUMF must be stricken from the record as immaterial.

Notwithstanding the above, Plaintiffs' SUMF which have been admitted by Defendants' RSUMF as well as the *Additional Statements of Uncontested Material Facts* ("ASUMF"), are firmly supported by evidence and demonstrate that there are no genuine issues for trial. (*See SUMF ¶¶ 2, 3, 6-13, 16-18; RSUMF ¶¶ 2, 3, 6-13, 16-18; ASUMF ¶¶ 1-16*). The Department of Health is entitled to summary judgment in its favor, as the evidence overwhelmingly supports that the Department of Health's policy and practice does not violate Plaintiffs' constitutional rights. This court should therefore deny Plaintiffs *Motion for Summary Judgment* and grant the Department of Health's *Cross Motion for Summary Judgment*.

## IV.    DISCUSSION

### A.  Section 1983 of the Civil Rights Act, 42 U.S.C. §1983.

Section 1983 in itself does not create substantive rights, but merely provides a venue for vindicating federal rights elsewhere conferred. Graham v. M.S. Connor, 490 U.S. 386 (1989). It creates a private right of action for redressing abridgments or deprivations of federally assured rights. Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004); Mcintosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995); Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996).

To establish liability pursuant to section 1983, a plaintiff must first establish that "the conduct complained of was committed by a person acting under color of state law." Parrat v. Taylor, 451 U.S. 527, 535 (1981). Secondly, a plaintiff must allege facts sufficient to conclude that the alleged conduct worked a denial of rights secured by the Constitution or laws of the United States. See Cepero-Rivera v. Fagundo, 474 F3d 124 (1st Cir. 2005); Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005) cited in Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145 (1st Cir. 2006). A section 1983 violation occurs when an official acting under color of state law acts to deprive an individual of a federally protected right. Maymí v. Puerto Rico Ports Authority, 515 F.3d 20, 205 (1st Cir. 2008). Moreover, plaintiffs must show that defendants' actions were the cause in fact of the alleged constitutional deprivation. Gagliardi v. Sullivan, 513 F. 3d 301, 306 (1st Cir. 2008).

Under section 1983, a plaintiff must show that the defendants were involved in the alleged deprivation of their rights. To impose liability upon a defendant, it is necessary that "the conduct complained of must have been casually connected to the deprivation." Gutiérrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989). The element of causal connection requires that plaintiffs establish that the defendants: (i) were personally involved in the violation, see Monell v. Department of Social Services, 436 U.S. 658, 694 n. 58 (1978); and (ii) their conduct was

intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights. Simmons v. Dickhaut, 804 F. 2d 182, 185 (1st Cir. 1986).  Causation is an essential element of a section 1983 cause of action. A plaintiff cannot succeed in a civil rights action if they fail to demonstrate a causal connection between the state's official's alleged wrongful action and the alleged deprivation. See Reimer v. Smith, 663 F.2d 1316, 1322 (5th Cir. 1981).

To succeed in an action pursuant to section 1983, the plaintiff, who has the burden of proof, first must show official conduct. That is, an act or omission undertaken under color of state law. Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996). Second, the plaintiff must satisfy the "constitutional injury" requirement by making a showing of a deprivation of a federally secured right. Baker v. McCollan, 443 U.S. 137, 142 (1979); Nieves v. McSweeny, 241 F.3d 46, 53 (1st Cir. 2001).  As will be shown, the Department of Health's policy and practice does not constitute a violation of Plaintiffs constitutional rights as it is in strict compliance with the Puerto Rico Civil Code and Vital Statistics Registry's Act.

**B. The Department of Health's Policy and Practice is Constitutional.**

At the outset, it must be underscored that Plaintiffs are not challenging the constitutionality of Puerto Rico law. They are challenging the Government's policy and practice of not contemplating a nonbinary gender marker. (Docket No. 12, ¶ 37). The Department of Health's policy and practice when issuing Birth Certificates is done in strict compliance with the Puerto Rico Civil Code and the Vital Registry's Act. The Department of Health and its Demographic and Vital Statistics of Puerto Rico are part of the executive branch of the government and cannot issue a birth certificate with a nonbinary gender marker identified as "X" that has not been recognized by the Legislature. *See ASUMF* ¶ 14.

Birth certificates offer vital information for the use of public officials. Recording the circumstances of these births provide insights about population changes, demographics, fertility rates, infant mortality, and other medical issues. To capture this data, the States record the facts of each person's birth and compile them in a birth certificate. Moreover, the Federal Government has great interest in the information compiled by the states and asks them to record information about every birth and compiles the nationwide data in an annual report. 4 U.S.C. 242k(g)(h). This information allows the support of statistical and epidemiological activities that improve the effectiveness, efficiency, and quality of health services. Id. at 242k(a).

In Puerto Rico, the process to collect vital statistics data as well as the process to issue certifications is regulated by the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §5311, et seq.[3] ("the Civil Code") and the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 et seq. The Puerto Rico Civil Code is a general law which rules on multiple issues related to human life and daily human interactions. See Statement of Motives of Puerto Rico Civil Code, Act No. 55 of June 1st, 2020, as amended. As to all facts and judicial acts concerning a person's civil status, the Civil Code dictates that it will be registered in the Demographic Registry of Puerto Rico. Its organization and administration is ruled by special legislation. P.R. Law ann. tit. 31 §7631. The Demographic Registry will have registration of the circumstances of birth, the registered person's name, and the person's sex at birth, among other demographic facts. Id. at §7632.

As to the modification of a person's sex in the register, article 694 of the Puerto Rico Civil Code states:

> No amendments will be authorized in the original birth record. A court may issue a judgment authorizing the register to make a note on the original register's margin

---

[3] On June 1, 2020, the Government of Puerto Rico approved Act No. 55 of June 1st, 2020, as amended, also known as the Puerto Rico Civil Code, P.R. Law ann. tit. 31 §5311, et seq. Since its approval, Article 694, P.R. Law ann. tit. 31 §7655, has not been subject to state court interpretation.

of the person's sex, when applicable, due to a posterior change or modification to the sex at birth. However, in these cases, the substitution of the historical and vital act of sex at birth will not be authorized. Only in the case where a medical expert determines the ambiguity of the sex at birth, at the time of birth, and this fact is registered in the records of the Demographic Registry will the judicial authority order the substitution of the original sex at birth in the demographic registry records.

Nothing here construed will undermine the process established in cases of a request for change of gender in a birth certificate. These requests will be accompanied with the Passport, driver's license or a certification submitted by a health professional who has a physician-patient relationship and certifies the applicant's gender. In these cases, the registry shall issue the certificate, safeguarding the right to privacy. 31 P.R. Law ann. tit. 31 §7655. (Translation ours).

Article 2 of the Civil Code establishes that the basis for Puerto Rico Law are the Constitution, the law, customs, as well as the general principles of law. P.R. Law ann. tit. 31 §5312. Additionally, Article 4 states that policy and customs will only govern in the absence of applicable law if it's not contrary to the moral or the public order and if its spontaneity, generality and constancy is proven. 31 P.R. Law ann. tit. § 5314. As to the interpretation and application of the Law, the Civil Code incorporates the rules of hermeneutics. When analyzing the wording used in the Civil Code, Article 25 states: "The words used in this Code in present tense, includes future tense; those used in male voice will also include the female voice, unless due to the nature of the disposition, it is limited only to one; a singular number will include the plural number, and the plural will include the singular number." P.R. Law ann. tit. 31 § 5347 (our translation).[4] As a result, the Civil Code recognizes the current practice of allowing transgender individuals to change the sex marker in their birth certificates to reflect the applicants' gender, whether its male or female.[5]

---

[4] Article 25, in its original Spanish language, states: "Las palabras usadas en este Código en el tiempo presente, incluyen también el futuro; las usadas en masculino incluyen el femenino, a menos que por la naturaleza de la disposición se limiten manifiestamente a solo uno; el número singular incluye el plural, y el plural incluye el singular." P.R. Law ann. tit. 31 § 5347.

[5] Article 694 of the Puerto Rico Civil Code was enacted after the ruling of <u>Arroyo González</u> v. <u>Rosselló Nevares</u>, 305 F. Supp. 3d 327 (D.P.R. 2018). In <u>Arroyo González</u>, the court recognized the process for a person to request a change

However, the Puerto Rico Legislative Assembly did not legislate nor recognize in its rule of hermeneutics a third nonbinary gender other than male or female. *See, ASUMF,* ¶¶ 4, 8-10. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negate every conceivable basis which might support it, whether or not the basis has foundation in the record. Heller v. Doe, 509 U.S. 312, 320-321 (1993) (internal quotations and citations omitted).

The Civil Code further establishes that the organization and administration of all vital facts and judicial acts concerning a person's civil status are ruled by the Vital Statistics Registry Act of Puerto Rico. P.R. Law ann. tit. 24 §1041 et seq. The Vital Statistics Registry Act creates a General Demographic Registry within the Department of Health. Its purpose is to register, collect, guard, preserve and certify vital facts of people born in Puerto Rico. Id. at § 1042 (1). *See, ASUMF,* ¶¶ 1-3. After the year 1931, the Demographic Registry became a formal and credible statistical registry that allows the study of vital statistics of our population. See Statement of Motives of Act No. 220 of August 9, 1998, also known as the Vital Statistics Registry Act of Puerto Rico, P.R. Law ann. tit. 24 §1041 et seq. It is the instrument that contains the official version of the existence, civil status and vital facts of the people born in Puerto Rico. *See, ASUMF,* ¶ 4. The information that is contained in the Registry constitutes *prima facie* evidence of the fact to be proven. Ex Parte Delgado-Hernández, 165 D.P.R. 170, 187 (2005); Medina v. Pons, 81 D.P.R. 1, 8 n. 11 (1959);

---

of gender in their birth certificate. In the cited case, the district court issued an Order recognizing the right of transgender individuals to change the sex marker in their birth certificates with the applicants' gender identity under the principle of a constitutional right to privacy. Additionally, the court ordered the Demographic Registry of the Government of Puerto Rico to adopt the criteria of the Department of Transportation and Public Works "Request to Change Transgender Person's Gender Marker" as the application form to be submitted and accepted as the first step toward the issuance of their new birth certificates. In their application, individuals shall also present an official document, whether a passport, driver's license or a certification issued by a healthcare professional, that reflects that persons' true gender, **whether male or female**. Arroyo, supra., at 333-334. Neither the District Court nor the Legislative Assembly recognized a nonbinary gender marker.

<u>Bigas Surs.</u> v. <u>Comisión Industrial</u>, 71 D.P.R. 336 (1950); <u>Pueblo</u> v. <u>Ramírez</u>, 65 D.P.R. 680 (1946); <u>Mercado</u> v. <u>American Railroad Co</u>, 61 D.P.R. 228 (1943).

In <u>Ex Parte Delgado-Hernández</u>, the Puerto Rico Supreme Court expressed:

The Demographic Registry Act provides the procedure to amend the birth certificate, also as a manner of exception. The Act provides: the omissions or inaccuracies that appear on any certificate prior to being registered at the Department of Health can be corrected inserting the necessary corrections or additions in red ink on the certificate, but after being filed at the Department of Health, no rectification, addition or amendment can be made that substantially alters the same, but only by virtue of a Court Order, which shall be filed at the Department of Health making reference to the corresponding certificate.

165 D.P.R. at p. 188.

As noted by the Puerto Rico Supreme Court, the Demographic Registry Act is complemented by section 1071-19 of the Demographic Registry Regulations, which provides:

Corrections or alterations after the inscription is made- after the certificate has been accepted by the Registrar, it cannot be the object of any change, erasure or alteration, nor can the transcription made in the record book be changed without due process of law. <u>Id</u>.

Pursuant to the Civil Code, the Vital Statistics Registry Act of Puerto Rico, and as ruled by the Puerto Rico Supreme Court, there are only two (2) ways for the correction of mistakes in a birth certificate: (i) before the certificate is registered; and (ii) after the certificate has been registered at the Department of Health. The Puerto Rico Supreme Court has interpreted the Vital Statistics Registry Act of Puerto Rico restrictively, concluding that any change requested must have been previously authorized by law. <u>Ex Parte Delgado-Hernández</u>, 165 D.P.R. at 189; <u>Ex Parte León Rosario</u>, 109 D.P.R. 804 (1980).

Article 694 of the Puerto Rico Civil Code, 31 P.R. Law ann. tit. 31 §7655, and the United States District Court for the District of Puerto Rico's opinion in <u>Arroyo, supra</u>, allow for change in the birth certificate when the applicant is a male or female transgender person.  Yet, the Puerto

14

Rico Civil Code and the Vital Statistics Registry Act do not authorize a change in a person's birth certificate to reflect a gender other than male or female. *See ASUMF,* ¶¶ 4, 6, 8-10.

The Puerto Rico Department of Health and its division of Demographic Registry and Vital Statistics are part of the executive power. The executive power contemplates the authority to execute, carry out, and enforce the laws. It does not make the laws in first instance. *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker"). In order to alter the established policy and practice of the Demographic Registry to issue birth certificates with male or female markers, which has been the use and custom since the inception of the Demographic Registry, it must be done through legislation. *See ASUMF,* ¶¶ 14, 16. To alter use and customs, legislation is needed. By definition, the courts must not entertain the instant controversy from the bench, without considering the country's preferences, reflected through its elected officials. Cintrón-Román v. Jiménez Echevarría, 210 D.P.R. 1, 9 (2023) (Translation ours). The Department of Health and the Division of Demographic Registry and Vital Statistics collects and custodies the instruments which contain the official version of the existence and vital facts of the people of Puerto Rico, which constitutes *prima facie* evidence. *See ASUMF,* ¶¶ 1-3. As a result, the Department of Health and the Division of Demographic Registry and Vital Statistics cannot authorize Plaintiffs' request for change in the birth certificate without clear legislation to that effect.

**Summary Judgment is warranted as to the Department of Health**

As amply discussed, and considering Plaintiffs' SUMF and Defendants' RSUMF and ASUMF, summary judgment is warranted as to the Department of Health. To this date, neither the Vital Statistics and Registry Act nor the Puerto Rico Civil Code have recognized an "X" gender

marker in birth certificate or other government issued documents. *See, SUMF, ¶ 3; RSUMF, ¶ 3; ASUMF, ¶¶* 4, 8-10. Moreover, even though in <u>Arroyo</u>, <u>supra</u>, a district sister court ordered the Demographic Registry issue an amended birth certificate to persons who identified as transgender, it only considered two (2) gender markers, female or male. As such, the Puerto Ricos's current legal framework does not consider "X" a gender marker for birth certificate or other governmental documents. *See, SUMF*, ¶¶ 2-3; *RSUM*F, ¶¶ 2-3; *ASUMF*, ¶¶ 4-6, 8-10; 14. Since the Government of Puerto Rico nor the state courts have recognized an "X", the Department of Health and the Demographic Registry do not have the authority to create a new gender category without legislative approval. *See, ASUMF* ¶ 14, 16.

## C. The Department of Health's policy and practice does not discriminate on the basis of sex and does not violate the Equal Protection Clause.

Plaintiffs claim that because Puerto Rico's Birth Certificate policy violates the Fourteenth Amendment under the Equal Protection clause by not allowing for cisgender and transgender persons to have a birth certificate that reflects their gender identity, it discriminates against a nonbinary person on the basis of sex. (Docket No. 12, ¶¶ 3-16). They contend that Defendants' policy engages in sex-based discrimination, subject to heightened scrutiny. (Docket No. 36, pg. 16-17).[6] However, gender identity and transgender status are not a suspect classification under the Equal Protection Clause and therefore should be analyzed under the rational basis framework.

The Equal Protection Clause provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV §1. It is "essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne</u> v. <u>Cleburne</u>

---

[6] When making reference to any page number in *Plaintiffs' Motion for Summary Judgment*, it will be to the Docket Entry page number at the top of the page.

<u>Living Ctr</u>. 473 U.S. 432 (1985). It is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. <u>FCC</u> v. <u>Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993).

The guarantee of equal protection coexists with the reality that most legislation must be classified for some purpose or another. <u>See</u> <u>Romer</u> v. <u>Evans,</u> 517 U.S. 620 (1996). Thus, Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." <u>Nordlinger</u> v. <u>Hahn</u>, 505 U.S. 1, 10 (1992). The language in the Equal Protection clause "was not designed to compel uniformity in the face of difference," <u>Whitney</u> v. <u>State Tax Comm'n</u>, 309 U.S. 530, 542 (1940); rather it bars only "intentional and arbitrary discrimination." <u>Glicher</u> v. <u>Mich Liquor Control Comm'n</u>, 160 F.2d 96, 99 (6th Cir. 1947) (quotations omitted).

When considering an equal protection claim, the court must first determine what level of scrutiny applies and then determine whether the law or policy at issue survives such scrutiny. Laws that discriminate based on suspect classifications, such as race or sex, receive heightened review. <u>City of Cleburne</u> v. <u>Cleburne Living Ctr.</u>, 473 U.S. at 440-441. Otherwise, laws are "presumed to be valid" and will be upheld if they bear a rational relationship to a legitimate state interest. <u>Id</u>. at 440.

In determining what level of scrutiny applies to a plaintiff's equal protection claim, the court looks for the basis of the distinction between the classes of persons. <u>See</u> <u>O.S.</u> v. <u>Carolene Products Co.</u>, 304 U.S. 144, 152 n.4 (1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying a strict scrutiny." <u>Price-Cornelison</u> v. <u>Brooks</u>, 524 F.3d 1103, 1109 (10th Cir. 2008). On the other hand, if the challenged government action does not implicate a fundamental right or a protected class, the court will apply a rational

17

basis review. <u>Carney</u> v. <u>Okla. Dep't of Public Safety</u>, 875 F.3d 1347 (10th Cir. 2017). Under the rational standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>F.C.C. v. Beach Commc'ns, Inc.</u>, 508 U.S. 307 (1993).

Since "[e]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the starting point for evaluating the constitutionality of a law, policy or practice under the Equal Protection Clause is the rational basis test. <u>F.C.C. v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313 (1993). Therefore, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." <u>Id</u>. This standard of review is a paradigm of judicial restraint. <u>Id</u>.

Plaintiffs argue that the Department of Health's policy and practice discriminates on the basis of gender, which is also discrimination on the basis of sex. They invoke the Supreme Court's generic statement that "all gender-based classifications today warrant heightened scrutiny." <u>United States</u> v. <u>Virginia</u>, 518 U.S. 515 (1996) (Docket No. 36, p. 16). Moreover, they claim that following <u>Bostock</u> v. <u>Clayton County</u>, 590 U.S. 644 (2020), a classification denying a person who identifies as nonbinary a birth certificate with an "X" gender marker is a determination on the basis of sex. Such interpretation of <u>Bostock</u> is incorrect because this contention is premised on a Title VII case which does not apply to an equal protection claim. As the Supreme Court stated, its text driven reasoning in <u>Bostock</u> applies only to cases brought under Title VII and declined to prejudge other discrimination laws. <u>Id</u>. at 680-681; <u>Pelcha</u> v. <u>MW Bancorp, Inc.</u>, 988 F.3d 318, 324 (6th Cir. 2021) (refusing to apply <u>Bostock</u> to the Age Discrimination in Employment Act); <u>Meriwether</u> v.

Hartop, 992 F.3d 492, 510 n. 4 (6th Cir. 2021) (reasoning that Title VII analysis does not apply to Title IX).

The differences between the language of the statute and the Constitution supply an initial reason why Bostock does not apply to an Equal Protection Clause.[7] L.W. v. Skrmetti, 83 F.4th 460, 484 (6th Cir. 2023). Were the Court to import the Title VII test into the Fourteenth Amendment, as Plaintiffs suggest, it would also require adding Title VII's defenses to the Constitution. Id. As such, The Supreme Court's reasoning in Bostock is inapplicable in the instant case since its decision is limited to employment under Title VII and does not extend to the broader issue of recognizing nonbinary gender markers on vital records.

The Department of Health and the Demographic Registry implement its policy and practice fairly, treating all citizens alike by issuing a birth certificate with a male or female sex designation. As such, it does not deny benefits stemming from a basic right protected by equal protection or substantive due process. Pavan v. Smith, 582 U.S. 563, 566-67 (2017). But absent an existing fundamental right, the Constitution does not require the States to embrace Plaintiffs' view of what information a birth certificate must record. Gore v. Lee, 107 F. 4th at 557.  In this way, the Department of Health's policy and practice in recording sex, whether male or female, instead of a non-binary gender identity, does not withhold a constitutionally prescribed benefit. The Department of Health's policy and practice treats all sexes equally by issuing a birth certificate that states whether that citizen is male or female. See, ASUMF, ¶¶ 4, 6, 9-10, 14.

---

[7] Title VII focuses on but-for discrimination: It is "unlawful…for an employer…to discriminate against any individual…because of…sex." 42 U.S.C. § 2000e-2(a)(1). Meanwhile, the Equal Protection Clause focuses on the denial of equal protection: "No State shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Plaintiffs claim that the Department of Health's policy and practice discriminates on the basis of gender and must be classified as a suspect or quasi suspect class is incorrect. (Docket No. 36, p. 16). For a class to be classified as a suspect or quasi-suspect class, it must have been subjected to discrimination; exhibit obvious, immutable, or distinguishing characteristics that define them as a discreet group; and considered a minority or politically powerless. See, e.g. Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 313-314 (1976). The Supreme Court "has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth." Ondo v. City of Cleveland, 795 F.3d 597, 609 (6th Cir. 2015). It follows that Courts have not recognized a person's transgender status as a suspect class. This is because transgender individuals "do not exhibit obvious, immutable, or distinguished characteristics that define them as a discrete group." Bowen v. Gilliard, 483 U.S. 587 (1987) (quotation omitted). The Sixth Circuit has stated that transgender identity refers to "a huge variety of gender identities and expressions." Gore v. Lee, 107 F. 4th at 558. Due to this, gender identity is not ascertainable at the moment of birth and can change over time. Id. Gender identity is a person's internal sense of their own gender and, since it is not an obvious, immutable or distinguishing characteristic, cannot be defined as a discrete group. As a result, it fails to meet the criteria to qualify as a suspect class. L.W. by and through Williams v. Skrmetti, 83 F.th 460, 486-88 (6th Cir. 2023).

Moreover, Plaintiffs fail to show that the Department of Health's policy and practice stems from animus against nonbinary individuals or that it was created with such a goal. The Department's policy and practice long predates the medical diagnosis of gender dysphoria or the consideration of a third nonbinary gender. Also, Plaintiffs have not established a cognizable claim of political powerlessness. See, Cleburne, 473 U.S. at 445. The political record shows that multiple

states and cities have implemented new laws benefitting nonbinary transgender individuals. As the *Second Amended Complaint* states, transgender individuals have had political success in convincing state governments throughout the United States to permit identification documents to match their gender identity. *See, ASUMF*, ¶ 16. "These and other legislative measures in favor of transgender rights make it difficult to maintain that their cause is one destined for political failure." Gore v. Lee, 107 F. 4th at 558-560. Consequently, it is necessary to conclude that transgender individuals do not occupy "a position of political powerlessness" that requires extraordinary protection from the majoritarian political process." San Antonio Indep. Sch. Dist. v. Rodríguez, 411 U.S. 1, 28 (1973). The Department of Health's policy and practice does not exceed its discretion in issuing birth certificate records with a male or female gender marker since States have considerable discretion in defining the terms used in their own laws and in deciding what records to keep. Shurtleff v. City of Boston, 596 U.S. 243, 251 (2022).

In the absence of any foundation for a heightened review, the Court must conclude that the Department of Health's policy and practice is supported by a rational basis. FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993). Equal Protection does not give a free hand for courts to judge the fairness or logic of legislative choices. Id. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is a reasonably conceivable state of facts that could provide a rational basis for the classification. Id.

Ample legitimate explanations support the Department of Health's policy and practice. First, it is the Department of Health's policy and practice to maintain legislative integrity and authority. "Only the written word is the law, and all persons are entitled to its benefit." Bostock v. Clayton County, 590 U.S. at 653. This principle supports the State's position that creating a new

gender category, such as "X," without legislative approval undermines the separation of powers. Only the state legislature has the authority to enact such changes and ensure democratic accountability and avoid administrative overreach. *See, ASUMF,* ¶¶ 14-16.

Second, The Department of Health has an interest in maintaining the integrity of public records. *See,* ASUMF*,* ¶¶ 15. Birth certificates serve vital functions as foundational legal documents and maintaining biologically based classifications ensure their reliability and historical accuracy. See, Tuan Anh Nguyen v. INS, 533 U.S. 53, 73 (2001) (respecting this "most basic biological difference []" avoids the risk of "making the guarantee of equal protection superficial"); Pavan v. Smith, 582 U.S. at 568 (Gorsuch, J. dissenting) (noting that "rational reasons exist for a biology based birth registration scheme…line ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders"); Kasper v. School Board of St. Johns County, 57 F. 4th 791, 803 n. 6 (2022) (noting that "biological sex…is the driving force behind the Supreme Court's sex-discrimination jurisprudence"). Insisting that birth certificates include some metrics, such as sex, time and date of birth remain unchanged absent evidence of error correlates with the Department of Health's stated interests and its viewpoints about the best way to keep records of birth in the State. *See, ASUMF,* ¶¶ 1-4;14-16.

The rational standard of review does not require States to show that a classification is the only way, the best way, or even the most defensible way to achieve their interests. FCC v. Beach Commc'ns, Inc., 508 U.S. at 313; Mas. Bd. of Ret. v. Murgia, 427 U.S. 307, 316 (1976). It requires only that "some plausible reason" supports the classification, no matter how imprudent or ineffective. Tiwari v. Friedlander, 26 F. 4th 355, 361-62 (6th Cir. 2022). A state "does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect."

<u>Murgia,</u> 427 U.S. at 316. The Department of Health's policy and practice treats both sexes equally by issuing a birth certificate that states whether that citizen is male or female. *See ASUMF,* ¶¶ 4, 6, 10.  This being the case, the Department of Health's policy and practice of not including an "X" marker in its records rationally correlates with the State's interest in consistency and historical accuracy of its vital statistic records. *See, ASUMF,* ¶¶ 14-16.

**Summary judgment is warranted as to the Department of Health**

When considering Plaintiffs' SUMF, Defendants' ASUMF, and the legal arguments previously discussed, it is necessary to conclude that the Department of Health's policy and practice does not discriminate on the basis of sex and therefore, does not violate the Equal Protection Clause. It is uncontested that the Department of Health treats all sexes equally and issues birth certificates to all its citizens with a female or male marker. *See, SUMF* ¶¶ 2-3; *RSUMF* ¶¶ 2-3; *ASUMF*, ¶¶ 4, 6, 8-10, 14.

First, Plaintiffs assertion that the Department of Health's policy and practice discriminates on the basis of gender and must therefore be classified as a suspect or quasi suspect class is incorrect. As discussed, for a class to be classified as a suspect or quasi suspect class, it must have been subject to discrimination; exhibit obvious, immutable, or distinguishing characteristics that define them as a discreet group; and considered a minority or politically powerless. See, e.g. <u>Massachusetts Board of Retirement</u>, 427 U.S. at 313-314. However, transgender individuals do not exhibit obvious, immutable or distinguished characteristics that define them as a discreet group. Gender identity is a person's internal sense of their own gender and, since it is not ascertainable at the moment of birth, it can change over time. <u>Gore</u> v. <u>Lee</u>, 107 F 4th at 558. *See, SUMF*, ¶¶16-18; *RSUMF*, ¶¶ 16-18. Since gender identity is not an obvious or immutable characteristic, it fails to meet the criteria to qualify as a suspect class. Additionally, Plaintiffs have

not shown that that individuals who identify as nonbinary are politically powerless since it is uncontested that the Department of State of the United States of America as well as multiple states have recognized a third gender option as "X". *See SUMF*, ¶ 6; *RSUMF* ¶ 6; *ASUMF*, ¶ 16. As a result, it is evident that a classification based on gender identity is not a classification on the basis of sex and is not subject to heightened review.

The Department of Health's policy and practice is supported by its intent to maintain legislative integrity and authority. Moreover, creating a new gender category such as "X, without legislative approval undermines the separation of powers. As such, it is up to the state legislature to enact such a change and ensure democratic accountability and avoid administrative overreach. *See, ASUMF*, ¶¶ 14-16. Additionally, the Department of Health has a legitimate interest in preserving, certifying, analyzing and maintaining the integrity of public records. *See, ASUMF*, ¶¶ 1-4; 15. As such, it is uncontested that the Department of Health's policy and practice of not including an "X" marker in its records rationally correlates with the states interest in consistency and historical accuracy of its vital statistic records. *See ASUMF* ¶¶ 1-4, 14-16.  Therefore, this Court should deny Plaintiffs' request for summary judgment and grant Defendants' request for the same.

**D.  The Department of Health's policy and practice does not infringe upon a fundamental right protected by the Fourteenth Amendment's Substantive Due Process Clause.**

Plaintiffs bring a Fourteenth Amendment substantive due process claim arguing that the Department of Health's policy, as applied, interferes with their fundamental right to individual autonomy and consists of a deprivation of liberty that "shocks the conscience." (Docket No. 12, ¶¶ 61-69).  The Department of Health's policy and practice, however, is not conscience shocking under the Due Process Clause. And even assuming Plaintiffs adequately alleged conscience shocking conduct, they failed to plead a cognizable liberty or property interest.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without the due process of law. U.S. Const. amend. XIV §1. The Supreme Court of the United States has recognized that the Due Process Clause protects two categories of substantive rights: (i) the rights guaranteed by the first eight amendments; and (ii) a select list of fundamental rights that are not mentioned in the Constitution. Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 237-238 (2022). In deciding whether a right falls into either of these categories, the Court has long asked whether the right is "deeply rooted in history or tradition" and whether it is essential to our Nation's "scheme of ordered liberty." Id.  "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the liberty protected by the Due Process Clause because the term liberty alone provides little guidance." Dobbs, 597 U.S. at p. 239.

A Plaintiff's substantive due process claim challenges the specific acts of a state officer and must show that both the acts were so egregious as to shock the conscience that they deprived them of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but plaintiff must also show a deprivation of a protected interest). A conscience shocking conduct is an indispensable element of a substantive due process challenge to executive action. DePoutot v. Raffaelly, 424 F.3d 112, 118 n. 4 (1st Cir. 2005).

There is no scientifically precise formula for determining whether executive action is sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment. See Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (referring to the inquiry as "virtually standardless"). Therefore, the analysis will vary with the subject matter and circumstances.

The First Circuit has stated that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting Depoutot, 424 F.3d at 119). For example, for a conduct to be deemed as conscience shocking, it must be "at the very least, extreme and egregious" or "truly outrageous, uncivilized, and intolerable." Id.  A mere violation of state law, even violations resulting from bad faith, do not invariably amount to conscience shocking behavior. Id. The allege conscience shocking behavior "must be stunning." Amsden v. Moran, 904 F.2d 748 (1st Cir. 1990).

The appellate court has consistently ruled that the substantive due process may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determination of a state or local decisionmakers, whether those decisions are right or wrong. Any permit or license denial, no matter how unattractive, falls short of being "truly horrendous" and is unlikely to qualify as conscience shocking for a substantive due process claim. Pagán, 448 F.3d at p. 33. This standard is rigorous but necessary since a lesser standard would run the risk of "insinuate[ing] the oversight and discretion of federal judges into areas traditionally reserved for the states and local tribunals and would dash any hope of maintaining a meaningful separation between federal and state jurisdiction." Id. (quoting Creative Environments, Inc. v. Estabrook, 680 F.2d 822 (1st Cir. 1982)).

Plaintiffs failed to identify a fundamental right that is protected by the Fourteenth Amendment. "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding documents mean." Dobbs, supra, at 235. When Amnesty International Puerto Rico Chapter requested an amendment to the application for gender change in Vital Events Certification to include "X" as an alternative for nonbinary, intersex or gender nonconforming persons, the Department of Health ultimately responded that

since the Legislative Assembly nor the courts had addressed this particular request, they were impeded from making the change. *See, ASUMF,* ¶¶ 12-14. Defendants' application of its policy is not conscience shocking, extreme, egregious, or horrifying. Therefore, Plaintiffs' substantive due process claim must be dismissed with prejudice.

Even assuming *in arguendo* that Plaintiffs adequately alleged a conscience shocking conduct by the Department of Health, they failed to plead a cognizable claim of liberty or property interest. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Therefore, Plaintiffs must show that the right is somehow implicit in the constitutional text and that the Due Process clause provides substantive protection for Plaintiff's right to privacy and autonomy under the "liberty" interest. Dobbs, supra. at 215.

Here, Plaintiffs do not allege sufficient facts for this court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. They claim that since the District Court's decision in Arroyo González, transgender people have the right to change the gender that appears in their birth certificates from one gender to another (male or female) but point to no authority suggesting that a non-binary classification has existed prior to the year 1931, when the Demographic Registry became a formal and credible statistical registry. See Statement of Motives, Act No. 220 of August 9, 1998.

Plaintiffs allege that seventeen (17) states, New York City, and several municipalities acknowledge nonbinary genders on birth certificates. (Docket No. 12, p. 10-12, ¶¶ 35-36; Docket No. 29, p. 10, ¶ 36). These states and municipalities, however, authorized nonbinary genders on birth certificates throughout the legislative process and not via the courts. *See, ASUMF*, ¶ 16. It follows that the right to include nonbinary genders on birth certificates was not reasonably

27

considered, or even existed, when the Fourteenth Amendment was adopted. See Dobbs, 597 U.S. at 251 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise").

Plaintiffs also failed to plead how the right of a transgender person to self-determination and autonomy is an essential component of ordered liberty. An individual's freedom to act does not confer the right to compel the government to act. Brown v. Cooke, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name change and reform its records accordingly"). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of liberty, but it is not an integral component of "ordered liberty" as defined by the Supreme Court. See Dobbs, 597 U.S. at 256 ("License to act on the basis of such beliefs may correspond to one of the many understandings of "liberty," but it is certainly not "ordered liberty"").

Moreover, Plaintiffs invoked the *stare decisis* doctrine stating that the instant matter was already discussed by another sister court in this district in Arroyo González. But as previously discussed, the substantive due process right to "informational privacy" applied in Arroyo González is not deeply rooted in history and tradition. The Supreme Court has stated without elaboration that there exists a due process interest in avoiding disclosure of personal matters. Whalen v. Roe, 429 U.S. 589, 599 (1977). The Court has said little else on the subject ever since. Nat'l Aeronautics & Space Admin. v. Nelson, 562 U.S. 134, 146 (2011); Id. at 162 (Scalia, J., concurring in judgment) (noting that "there is no constitutional right to informational privacy"). "[H]istory shows that, however important individuals may perceive the designation of their sex on a birth

certificate, it is only recently that States have modified their laws to permit sex designations to conform to gender identity." <u>Gore</u> v. <u>Lee</u>, 107 F. 4th at 562.

As a result, Plaintiffs fail to show sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate to reflect a nonbinary gender identity, or that such right is fundamental to the scheme of ordered liberty.

**Summary Judgment is warranted as to the Department of Health**

When considering Plaintiffs' SUMF, as well as Defendants' ASUMF, it is necessary to conclude that the Department of Health has not violated a fundamental right under the Fourteenth Amendment. When Plaintiffs requested an amendment to include an "X" in the application for gender change in vital events certification, the Department responded that since neither the Legislative assembly nor the courts had addressed this, they were unable to make such a change. *See SUMF* ¶¶ 3, 7; *RSUMF* ¶¶ 3, 7; *ASUMF*, ¶¶ 11-14. As such, it is uncontested that such an action is not conscience shocking, extreme egregious or horrifying.

Similarly, the Department of Health's policy and practice does not violate Plaintiffs' liberty given that the right to amend a sex designation on a birth certificate is not historically protected. Since 1931 the Demographic Registry has studied and collected the vital statistics of people of Puerto Rico and it has not recognized the authority to include an "X" gender marker. *See ASUMF* ¶¶ 1-4. Moreover, on June 1, 2020, the Government of Puerto Rico approved the most recent Civil Code and did not include an "X". *See ASUMF*, ¶¶ 7-10. Th record is devoid of a long history and tradition of amending sex designations on a birth certificate to include a nonbinary gender identity. In this way, this Court must grant Defendants' *Cross Motion for Summary Judgment* and dismiss the *Second Amended Complaint* with prejudice.

**E.  The Department of Health's policy and practice is not "compelled speech" and does not violate Plaintiffs' First Amendment Rights.**

Plaintiffs claim that Defendants' refusal to amend their birth certificates violates their First Amendment right to freedom by forcing them to lie in their gender identification. (Docket No. 36, p. 17). However, as this court will conclude, the contents of a birth certificate are government speech and therefore, do not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. Of Boston, 515 U.S. 557 (1995). However, the Free Speech Clause protection "extend[s]…only to conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006); see also Cressman v. Thompson, 798 F.3d 938, 952-953 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression").

The Department of Health's policy is only implicated when Plaintiffs present their birth certificates to a third party. However, "[t]he act of presenting identification" or "handing government documents" to someone else, has never been considered a form of expressive conduct. Interest of C.G., 976 N.W. 2d 318, 341 (2022); United States v. Cline, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment). When Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender nonbinary identity is not created by the sex designation listed on their birth certificates,

but by the various actions they take to present themselves as transgender nonbinary persons, that being in the way they dress or changing their legal name. The Department of Health's policy and practice does not restrict Plaintiffs' ability to express and present themselves as nonbinary persons nor does it prevent them from bringing their gender expression into alignment with their gender identities. Therefore, a change on a person's sex designation on their birth certificate does not restrict Plaintiffs' right to freedom of speech or expression.

Moreover, the content in a birth certificate is government speech and therefore does not imply the First Amendment. Government compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable… "invades the sphere of intellect and spirit which is the purpose of the First Amendment to our Constitution to reserve from all official control." Wooley v. Maynard, 430 U.S. 705 (1977) (quoting W.Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)). The government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation. See Hurley, 515 U.S. at 572. The "First Amendment Free Speech Clause does not prevent the government from declining to express a view." Shurtleff v. City of Boston, 142 U.S. 243 (2022). The government-speech doctrine provides that" [w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." Walker v. Tex. Div. Sons of Confederate Veterans, Inc., 576 U.S. 200 (2015) ("[G]overnment statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas").   In short, Plaintiffs have failed to show, as a matter of law, a First Amendment freedom of expression violation. This, because the Legislative Assembly has not recognized or included an "X" gender marker within the Demographic Registry.

**Summary Judgment is warranted as to the Department of Health**

Birth certificates are a communication of data chosen by the Commonwealth of Puerto Rico, on behalf of the government. A birth certificate is spoken by the government, who is certifying the information therein to be accurate, as opposed to the birth certificate holder. The State determines what information is required on a birth certificate, and what information can and cannot be subsequently amended. Walker, 576 U.S. at 121 ("[L]icense plates are, essentially, government ID's. And issuers of ID typically do not permit the placement on their ID's of message[s] with which they do not wish to be associated"). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. Id. As a result, Plaintiff's failed to prove a claim under the First Amendment and must therefore be dismissed with prejudice.

As amply discussed in Section B, the Vital Statistics and Registry Act, which created the Demographic Registry within the Department of Health, serves the purpose of registering, collecting, guarding and preserving the vital facts of people born in Puerto Rico. *See ASUMF ¶¶ 1-3.* Since its inception, neither the Government of Puerto Rico nor its Legislative Assembly have recognized or included an "X" gender marker within the Demographic Registry. The use and customs have always been limited to the female and male sex designations. *See ASUMF ¶¶ 4.* Therefore, this Court must enter summary judgment in favor of the Department of Health and dismiss the instant Complaint.

## V.    CONCLUSION

As this Court will surmise, no case or controversy exists in that the Department of Health's policy and practice is constitutional and, therefore, Summary Judgment is warranted in favor of the Defendants. The State's refusal to administratively allow an "X" gender marker designation

on birth certificates without legislative authorization is constitutionally justifiable. No controversy exists that the Department of Health has several important governmental objectives that support its policy, including maintaining consistency and reliability in vital records, ensuring public trust in the integrity of these documents and adhering to statutory framework. These objectives align with the government's interest in preserving accurate and historically consistent recordkeeping practices. Nothing in the Constitution deputizes Plaintiffs contention to override the legislature's judgment and demand policy they believe to be more favorable. Concluding otherwise would violate the most deeply rooted tradition of looking to democracy to answer public policy questions. As such, it is necessary to conclude that the Department of Health's policy and practice does not discriminate on the basis of sex. Therefore, summary judgment must be issued in favor of Defendants and the *Second Amended Complaint* dismissed with prejudice.

Moreover, Plaintiffs have failed to prove how the Department of Health's policy and practice shocks the conscience nor that there is a long history and tradition of protecting a right to amend a birth certificate to reflect a nonbinary gender or identity. Finally, the Department of Health's policy and practice does not violate Plaintiffs First Amendment Rights since the Government has not restricted their ability to express and present themselves in alignment with their gender identity. The Department of Health is entitled to summary judgment in its favor, as the evidence overwhelmingly supports that its policy and practice does not violate Plaintiffs' constitutional rights. This court should therefore deny Plaintiffs *Motion for Summary Judgment* and grant the Department of Health's *Cross Motion for Summary Judgment*.

**WHEREFORE,** appearing Defendants respectfully request the court to deny Plaintiffs' *Motion for Summary Judgment* and grant Defendants' *Cross Motion for Summary Judgment* and as a result, dismiss with prejudice all claims against them.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court, who will send notification of such filing to the parties subscribing to the CM/ECF System.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico on this 10th day of January 2025.

**JANET PARRA-MERCADO**
Appointed Secretary of Justice

**SUSANA I. PEÑAGARÍCANO-BROWN**
Interim Deputy Secretary in Charge of Litigation

*S/ Diana I. Pérez-Carlo*
**DIANA I. PÉREZ-CARLO**
USDC No. 307313
Email: diana.perez@justicia.pr.gov
Tel. (787) 721-2900, ext. 1419

**DEPARTMENT OF JUSTICE**
**OF PUERTO RICO**
Federal Litigation Division
PO Box 9020192
San Juan Puerto Rico, 00902-0192

34